INLAND STEEL INDUSTRIES,
INC., et al., Plaintiffs,

v.

UNITED STATES, Defendant,

and

Usinor Sacilor, et al., Defendants-
Intervenors.

Slip Op. 97–71.
Court No. 93–09–00567–CVD.

United States Court of
International Trade.

June 2, 1997.

Dewey Ballantine (Alan Wm. Wolff, Michael H. Stein, Martha J. Talley, John A. Ragosta and John R. Magnus, Washington, DC), for plaintiffs Inland Steel Industries, Incorporated; Bethlehem Steel Corporation; LTV Steel Company, Incorporated; National Steel Corporation; Armco Steel Company, L.P.; Geneva Steel; U.S. Steel Group a Unit of USX Corporation; Gulf States Steel Incorporated of Alabama; Sharon Steel Corporation; WCI Steel, Incorporated; Laclede Steel Company; and Lukens Steel Company.

Frank W. Hunger, Assistant Attorney General of the United States; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (A. David Lafer); Terrence J.

McCartin, Washington, DC, Office of Chief Counsel for Import Administration, United States Department of Commerce, of Counsel, for defendant.

Weil, Gotshal & Manges (Stuart M. Rosen, New York City, Mark F. Friedman and Jonathan Bloom), for defendants-intervenors Usinor Sacilor, Sollac and GTS.

Skadden, Arps, Slate, Meagher & Flom (John J. Mangan, Washington, DC), for defendants-intervenors U.S. Steel Group et al.

## OPINION

CARMAN, Chief Judge.

This case is before the Court on plaintiffs' Motion for Judgment on the Agency Record, pursuant to U.S. CIT R. 56.2. Both plaintiffs and defendant-intervenors challenge certain aspects of the Department of Commerce's ("Department" or "Commerce") *Final Affirmative Countervailing Duty Determinations: Certain Steel Products from France,* 58 Fed.Reg. 37,304 (Dep't Comm.1993) (final determ.) (*"Final Determination"*), and relevant portions of the *General Issues Appendix* to *Final Affirmative Countervailing Duty Determination: Certain Steel Products from Austria,* 58 Fed.Reg. 37,217, 37,225–73 (Dep't Comm.1993) (*"General Issues Appendix"*). Defendant asserts this Court should affirm Commerce's *Final Determination,* with the exception that it requests the Court remand to Commerce the issue of whether certain Crédit National export loans discovered at verification are countervailable.

The Court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (1988), and for the reasons set forth below, sustains the *Final Determination* with the exception that the Court remands to Commerce the issue of whether certain Crédit National export loans discovered for the first time at verification conferred a countervailable benefit on Usinor Sacilor.

## BACKGROUND

In accordance with a February 18, 1994 scheduling order, and after extensive consultation with the parties and upon their consent the parties were directed to brief five general issues arising out of determinations by the International Trade Administration addressing steel products from various countries, as well as country-specific issues raised by those determinations. In prior opinions, this Court has disposed of all challenges to the general issues. *See British Steel plc v. United States,* 936 F.Supp. 1053 (CIT 1996) (*"British Steel IV"*); *British Steel plc v. United States,* 929 F.Supp. 426 (CIT 1996) (*"British Steel III"*); *British Steel plc v. United States,* 924 F.Supp. 139 (CIT 1996) (*"British Steel II"*), appeals docketed, Nos. 96–1401 to –06 (Fed. Cir. June 21, 1996); *British Steel plc v. United States,* 879 F.Supp. 1254 (CIT 1995) (*"British Steel I"*), appeals docketed, Nos. 96–1401 to –06 (Fed. Cir. June 21, 1996). What remains before the Court are the parties' country-specific challenges to Commerce's steel determinations. This opinion addresses the French country-specific issues raised by the parties with respect to Commerce's *Final Determination* that remain following the issuance of this Court's opinions addressing the general issues. While the Court believes this opinion is in no way inconsistent with its prior opinions addressing the general issues, to the extent any perceived inconsistencies arise, this Court's findings in the general issues opinions prevail.

In this consolidated action, Inland Steel Industries, Incorporated, Bethlehem Steel Corporation, LTV Steel Company, Incorporated, National Steel Corporation, Armco Steel Company, L.P., Geneva Steel, U.S. Steel Group a Unit of USX Corporation, Gulf States Steel Incorporated of Alabama, Sharon Steel Corporation, WCI Steel, Incorporated, Laclede Steel Company, and Lukens Steel Company (collectively "plaintiffs" or "Inland Steel"), and Usinor Sacilor and two of its subsidiaries, Sollac and GTS (collectively "defendant-intervenors" or "Usinor Sacilor"), challenge certain aspects of the *Final Determination* and relevant portions of the *General Issues Appendix.*

The *Final Determination* addresses subject merchandise manufactured and exported by Usinor Sacilor during the period of investigation ("POI") of calendar year 1991. The *Final Determination* found a subsidy rate of

15.49% *ad valorem*, although this rate was later revised downward to 15.12% *ad valorem* when certain clerical errors in the *Final Determination* were corrected. *See Countervailing Duty Order and Amendment to Final Affirmative Countervailing Duty Determination: Certain Steel Products from France*, 58 Fed.Reg. 43,759 (Dep't Comm. 1993) (*"Amended Final Determination"*).

### A. Subsidies Examined in the Final Determination

During the course of its investigation, Commerce examined subsidies provided by the Government of France ("GOF") to the French steel industry, particularly to Usinor Sacilor and its predecessors.[1] Commerce's investigation revealed Usinor Sacilor and its predecessors received substantial subsidies, including various forms of grants, equity infusions and loans, from the GOF during the fifteen years preceding the POI, as the GOF tried to restructure and revitalize the French steel industry.

### 1. PACS

A principal component of the GOF's 1978 plan to assist French steel companies in restructuring their debts was the creation and issuance of *prêts à caractéristiques spéciales* ("PACS"), or loans with special characteristics, a new type of debt instrument. The principal terms of the PACS required the debtor company to: (1) make interest payments of 0.1 percent for the first five years following the loan; (2) make interest payments of 1.0 percent and make principal and supplementary interest payments, with the amount to be set by the Minister of Economy, beginning in the sixth year after receipt of the loan; (3) make the principal and supplementary interest payments from its profits; (4) pay the face amount of the PACS plus interest; and (5) subordinate the PACS to all other forms of debt, although PACS were superior to common stock.

Commerce concluded the PACS constituted debt instruments upon their issuance, based on its observation the PACS' repayment obligation and interest payment provisions were characteristics of a debt instrument.[2] *See General Issues Appendix*, 58 Fed.Reg. at 37,255. In reaching its determination, Commerce focused on the first criteria, noting "these instruments carry an obligation for repayment, even though there is no predetermined maturity date." *Id.* Additionally, with respect to the second criteria, Commerce observed "these instruments have guaranteed interest payments." *Id.*

In the course of subsequent restructuring of the French steel industry, the GOF and French steel companies periodically agreed to convert PACS into the debtor company's common stock in order to ease the steel companies' debt burdens. In 1981, French steel companies converted FF 13.8 billion worth of PACS into common stock, while the companies converted FF 12.6 billion and FF 2.8 billion worth of PACS into common stock in 1986 and 1991, respectively. With respect to the PACS conversions that occurred in 1981 and 1986, Commerce determined Usinor and Sacilor were not equity worthy in those years. As a result, Commerce determined the transactions were equity infusions[3] made on terms inconsistent with commercial considerations, and therefore countervailable.[4]

---

1. In its efforts to restructure the French steel industry in 1978, the GOF consolidated French steel producers into two major groups, Usinor and Sacilor. As part of a second restructuring plan, the GOF merged Usinor and Sacilor to create Usinor Sacilor in 1986.

2. In reaching this conclusion, Commerce applied a new methodology designed to differentiate hybrid financial instruments which could not easily be classified as either a debt or equity instrument. In order to classify financial instruments as either debt or equity instruments, Commerce "applied the following hierarchy [of criteria] which in the Department's view establishes whether an instrument has the qualities of debt or equity: (1) Expiration/Maturity Date/Repayment Obligation, (2) Guaranteed Interest or Dividends, (3) Ownership Rights, and (4) Seniority." *General Issues Appendix*, 58 Fed.Reg. at 37,254.

3. Based on its determination that PACS were debt instruments upon issuance, Commerce treated the conversion of PACS into common stock as a debt-to-equity conversion, a form of equity infusion.

4. The statute defines a domestic subsidy to include "[t]he provision of capital, loans, or loan guarantees on terms inconsistent with commercial considerations." 19 U.S.C. § 1677(5)(A)(ii)(I) (1988).

As for the 1991 conversions, Commerce determined Usinor Sacilor was equity worthy in 1991 and the equity infusion was not inconsistent with commercial considerations, and thus was not countervailable.

### 2. FIS Bonds

In 1983, the GOF created the *Fonds d'Intervention Sidérurgique* ("FIS"), or Steel Intervention Fund, to facilitate Usinor and Sacilor's exercise of their authority to issue convertible bonds.[5] Usinor and Sacilor issued convertible bonds to the FIS in 1983, 1984, and 1985. The FIS in turn issued bonds, guaranteed by the GOF, to the public. In 1986 and 1988, these bonds were converted to the companies' common stock as a means of easing their debt burden.

As with its analysis of the PACS, Commerce first determined the FIS bonds constituted debt upon issuance, noting the FIS bonds satisfied the first set of hierarchical criteria used to classify hybrid instruments as debt because "these instruments have fixed amortization schedules."[6] *General Issues Appendix*, 58 Fed.Reg. at 37,255. Additionally, Commerce determined the conversion of FIS bonds into common stock constituted a debt-to-equity conversion, or equity infusion, which was countervailable because Usinor and Sacilor were unequity worthy in 1986 and 1988 when the conversions were made.

### 3. Shareholders' Advances

Beginning in 1982, the GOF supplied Usinor and Sacilor with grants which were accounted for as shareholders' advances. The

advances, which carried no interest or other precondition, were intended to finance revenue shortfalls experienced by Usinor and Sacilor. The advances were distributed on an *ad hoc* basis, without any legislative mandate or specific agreement, although they did have to be authorized by the Ministry of Treasury. While Usinor and Sacilor did not distribute any of the shares to the GOF at the time they received the grants, the GOF and Usinor and Sacilor converted all the advances into the companies' common stock in 1986. In an effort to comply with the European Community's then newly applicable State Aids Code, which limited the subsidies a member state could bestow on its steel industry, the GOF discontinued its grants to Usinor and Sacilor in 1986.

Commerce determined the shareholders' advances constituted grants to Usinor and Sacilor. While Commerce typically treats typical shareholders' advances as loans, Commerce determined the shareholders' advances to the French steel companies should be treated as grants based on the facts surrounding their provision by the GOF.[7] Additionally, Commerce determined the shareholders' advances were nonrecurring grants based upon its observation the grants were "exceptional"[8] because "the [French steel companies] cannot expect to receive benefits on an ongoing basis from review period to review period and/or the provision of funds by the government must be approved every year." *General Issues Appendix*, 58 Fed. Reg. at 37,226.

---

5. The Corrected Finance Law, approved in 1982, granted Usinor and Sacilor authority to issue convertible bonds.

6. *See supra* n. 2 (discussing criteria applied by Commerce in classifying hybrid financial instruments).

7. The criteria established by Commerce to differentiate among grants, debt, and equity state that grants are "funds provided without expectation of a: (1) Repayment of the grant amount, (2) payment of any kind stemming from the receipt of the grant (including interest or claims on profits of the firm (i.e., dividends) ...), or (3) claim on any funds in case of company liquidation." *General Issues Appendix*, 58 Fed.Reg. at 37,254.

8. Prior to the issuance of the *Final Determination*, Commerce considered three factors in distinguishing recurring grants from nonrecurring grants, i.e., "(1) Whether the program providing the benefit is exceptional; (2) whether the program is longstanding; [and] (3) whether there is any reason to believe that the program will not continue into the future." *General Issues Appendix*, 58 Fed.Reg. at 37,226. In the *General Issues Appendix*, however, Commerce noted it had recently modified this test in completing its analysis in the *Final Determination*, placing its primary focus on the first element. Commerce stated it is more appropriate to examine only whether the benefits are of an "exceptional" nature because the new test focused "on the nature of the benefit provided to the recipient" and the last "two factors ... have been difficult to interpret and apply in practice." *Id.*

#### 4. FDES Loans

The GOF's *Fonds de Développement Economique et Social* ("FDES"), or Economic and Social Development Fund, was another means the GOF used to provide loans to the French steel industry. Following passage of The Law of July 13, 1978, FDES made available *prêts participatifs*, or participative loans, to all French companies. These loans were made available at below market interest rates, and provided for repayment through a share of future profits according to a formula agreed to by the parties. In 1990, FDES consolidated the principal amounts on outstanding FDES loans made to Usinor, Sacilor, and their subsidiaries. The result of the consolidation was the creation of multiple long-term loans which had a different structure and interest rate from the previous loans.

Commerce's *Final Determination* analyzed whether FDES' consolidation of the outstanding loans in 1990 satisfied the three elements of a countervailable loan.[9] Based on its determination the interest rates charged on the loans consolidated by FDES in 1990 were consistent with Usinor Sacilor's benchmark interest rate for 1990, Commerce concluded the consolidated loans were not countervailable because no special benefits were conferred on Usinor Sacilor through FDES' consolidation.

#### 5. CFDI Loans

Similar to the FDES loans, participative loans were also issued by the *Caisse Francaise de Développement Industriel* ("CFDI"). The participative loans issued by CFDI were available to all French companies and were provided at below market interest rates with repayment based on a share of future profits according to an agreed upon formula. In 1991, outstanding CFDI loans held by Usinor, Sacilor and their subsidiaries were transferred, with the terms unchanged, to Usinor Sacilor.

Commerce determined the key issue in analyzing the countervailability of the loans provided by CFDI was their specificity. In order to determine the specificity of the loans, Commerce examined data supplied by the GOF concerning the distribution of the CFDI loans issued from 1983 to 1988, rather than the distribution of the CFDI loans when Usinor Sacilor's outstanding loans were consolidated in 1991. While the GOF did provide Commerce with information on the distribution of the CFDI loans issued between 1983 and 1988, the information failed verification because "GOF officials could not provide any documentation supporting the data provided." *Final Determination*, 58 Fed.Reg. at 37,309. Commerce ultimately concluded the CFDI loans were countervailable, based on its determinations the CFDI loans were "de facto limited to a specific enterprise or industry or group of enterprises or industries," *id.*, and that the other two elements of a countervailable loan were satisfied.[10]

#### 6. Other Participative Loans

In addition to the participative loans issued by FDES and CFDI to Usinor Sacilor, during verification Commerce discovered loans described as "other participative loans" which had not been reported previously by Usinor Sacilor. Usinor Sacilor officials could not offer any explanation of these loans and failed to explain the number of loans involved, the duration of the loans, the outstanding principal balances on the loans, the interest rates applicable to the loans, and the principal and interest payments made on the loans. Because the "loans were unreported" and it had "no information about the programs under which these loans might have been issued," Commerce used best information available ("BIA") to calculate the countervailable benefit to Usinor Sacilor from the loans, treating them as zero interest rate, short-term loans. *See Final Determination*, 58 Fed.Reg. at 37,310.

---

**9.** In order to be countervailable, Commerce must determine a loan satisfies the following three criteria: (1) the existence of government action caused the issuance of the loan; (2) a benefit was conferred on the recipient firm by the loan; and (3) the loan was specific. *See* 19 U.S.C. § 1677(5) (1988); *Countervailing Duties; Notice*

of *Proposed Rulemaking and Request for Public Comments*, 54 Fed.Reg. 23,365, 23,379 (to be codified at 19 C.F.R. § 355.42) (hereinafter *"Proposed Regulations"*).

**10.** *See supra* n. 9.

### 7. Crédit National Loans

Crédit National, a financial institution owned by the GOF, was another source of long-term loans for Usinor Sacilor. In 1991, Usinor Sacilor's outstanding loans from Crédit National were consolidated. Commerce's determination the loans were consolidated in such a manner that "Credit National would obtain the same return that it would have earned on the pre-consolidated loans," led it to conclude the consolidation should not be treated as a new loan. *Id.* at 37,311.

In analyzing the specificity of the Crédit National loans, consistent with the methodology applied in examining the CFDI loans, Commerce "looked to the years in which the original loans were issued." *Id.* The *Final Determination* notes "[t]he law creating Credit National does not in any way limit the industries to which loans can be made" and "Credit National's Annual Reports demonstrate that loans in these years were in fact provided to numerous sectors and were not disproportionately provided to the steel industry." *Id.* Based on these observations, Commerce concluded the loans were nonspecific, and therefore not countervailable.

### 8. ECSC Article 54 Investment Loans

Under Article 54 of the treaty establishing the European Coal and Steel Community ("ECSC"), the Commission of the European Communities ("EC") provides industrial development loans to companies within the ECSC seeking to purchase new equipment or finance the modernization of existing plants. Commerce's EC Verification Report illustrates the importance of these loans to many member companies of the ECSC, noting "commercial banks were not willing to provide financing to the steel and coal industries due to the difficulties faced by these industries." EC Verification Report, Def.'s App. Tab 8 at 13.

Commerce determined the Article 54 loans, made possible by the EC Commission's obtaining funds from the financial mar-

kets and then reloaning those funds to ECSC member companies, were made to Usinor Sacilor at an interest rate below the long-term market rate. At verification, Commerce also determined the Article 54 loans were not made from any pool of funds to which Usinor Sacilor or other ECSC member companies may have contributed, thus eliminating any possibility the EC Commission was essentially loaning Usinor Sacilor its own money. Additionally, Commerce determined the Article 54 loans satisfied the remaining two elements of the countervailable loan criteria,[11] and therefore countervailed the Article 54 loans received by Usinor Sacilor.

### 9. DNEL-held PACS

In the course of the 1978 restructuring, the former private majority shareholders of Usinor and Sacilor, Denain Nord–Est Longwy ("DNEL") and Marine–Wendel,[12] respectively, agreed to convert certain loans to PACS at the direction of the GOF. The *Final Determination* concluded the PACS held by DNEL were "essentially written off in 1981 at a redemption value of FF 100," and stated that Commerce "treat[ed] the difference between the original value of the loan and the amount repaid as a grant." *Final Determination*, 58 Fed.Reg. at 37,308. Commerce determined the grant was not countervailable, however, because it did not exceed 0.50 percent of sales in 1981, and therefore the grant's benefit was expensed in 1981 and Usinor Sacilor received no countervailable benefit during the POI.

### 10. SODIs

In 1983, Usinor and Sacilor created subsidiaries known as regional development companies, or SODIs, at the request of the GOF. The SODIs sought to revitalize depressed steel regions in France and retrain steel workers for jobs outside the steel industry by loaning funds the SODIs obtained from Usinor and Sacilor to regional enterprises. Between 1983 and 1986, the SODIs made a substantial number of loans to enterprises in

---

**11.** *See supra* n. 9.

**12.** Although Usinor Sacilor did not pay any interest on the Marine–Wendel's PACS, in 1989 it repaid the full face value of the PACS held by Marine–Wendel. While Commerce treated these

PACS as zero interest rate loans, it did not countervail them because the benefits from the PACS expired when Usinor Sacilor repaid Marine–Wendel in 1989, prior to the POI of calendar year 1991.

the depressed steel regions. In 1986, however, Usinor Sacilor's obligation to fund the SODIs expired. Based on the success of the SODIs in generating regional economic development, the GOF requested Usinor Sacilor continue to provide loans to the SODIs in depressed steel regions and other regions in France. Following negotiations between Usinor Sacilor and the GOF, it was agreed Usinor Sacilor and the GOF would contribute funds to the SODIs on an equal basis. The agreement provided the GOF would transmit its share of the funds through Usinor Sacilor, with Usinor Sacilor receiving the funds from the GOF as shareholders' advances and then funneling those same funds to the SODIs. At verification, Commerce determined the GOF closely monitored Usinor Sacilor to verify the funds were being forwarded to the SODIs for regional development purposes, and that the funds were not used to support Usinor Sacilor's steel operations.

In evaluating whether Usinor Sacilor received a countervailable benefit from the GOF's contributions to the SODIs, Commerce examined whether the funds contributed by the GOF relieved Usinor Sacilor of any obligations it may have had to retrain or otherwise assist its displaced workers. The *Final Determination* noted that the SODIs' mission expanded after 1986, when they began "servicing depressed regions other than those suffering from steel industry lay-offs." *Final Determination*, 58 Fed.Reg. at 37,311. Commerce found the terms of the 1986 agreement between Usinor Sacilor and the GOF did not relieve Usinor Sacilor of any obligations it had when it was solely responsible for funding the SODIs between 1983 and 1986. The *Final Determination* concluded the GOF's contributions provided "no benefit to the company" and that "Usinor Sacilor merely channeled these contributions to the SODIs." *Id.*

B. *Commerce's Equity Worthiness Findings*

As part of its analysis in determining whether certain equity infusions made by the GOF between 1978 and 1991 are countervailable, Commerce examined whether Usinor Sacilor and its predecessors were equity wor-

thy at the time of each of the infusions. Commerce determined the companies were unequity worthy between 1978 and 1988, and therefore countervailed equity infusions made by the GOF during that period. Commerce also determined Usinor Sacilor was equity worthy in 1991, and therefore did not countervail the GOF's equity infusions made during the POI.

1. *1986 and 1988*

In concluding Usinor Sacilor was unequity worthy in 1986 and 1988, Commerce noted

Usinor, Sacilor and Usinor Sacilor reported substantial losses in each year until 1987. Stockholders' equity was negative in every year except 1986. Accordingly, certain financial indicators, such as rate of return on assets and equity and profit margin on sales, were negative until 1987. In 1988, Usinor Sacilor reported positive rates of return on assets and equity, profit margin on sales, and a positive debt to equity ratio.

*Final Determination*, 58 Fed.Reg. at 37,305.

Additionally, Commerce rejected defendant-intervenors' argument Usinor Sacilor became equity worthy following the implementation of the GOF's 1986 steel industry restructuring plan. In the *General Issues Appendix* Commerce stated while it "currently gives great weight to the company's recent rate of return on equity as an indication of financial health," it "tend[s] to place greater reliance on past indicators ... [which] provide a clear track record of the company's performance." *General Issues Appendix*, 58 Fed.Reg. at 37,244. Finally, Commerce determined a study prepared by McKinsey & Company, analyzing whether the GOF's proposals to restructure the French steel industry complied with EC Commission guidelines, was not worthy of consideration in analyzing Usinor Sacilor's equity worthiness. Commerce based this conclusion on its determination potential investors would not rely on the McKinsey study's use of EBITD (earnings before interest, taxes, and depreciation) figures, but rather would consider a company's net income in determining whether or not to invest in that company.

### 2. *1991*

In determining Usinor Sacilor to be equity worthy in 1991, Commerce considered Usinor Sacilor's relevant financial ratios from the preceding three years, as well as an independent Swiss consulting firm's analysis of a large investment by Crédit Lyonnais, a bank in which the GOF held a majority interest, in Usinor Sacilor. Commerce relied on various financial data as an indicator of Usinor Sacilor's past performance, while it utilized the Swiss consulting firm's report as an indicator of Usinor Sacilor's future prospects, and specifically whether Crédit Lyonnais was acting as a prudent investor in acquiring twenty percent of Usinor Sacilor's voting stock. *Final Determination*, 58 Fed.Reg. at 37,306.

### C. *Commerce's Subsidy Rate Calculations*

#### 1. *Benchmark Interest Rate*

In calculating the countervailable benefit a company receives from a preferential long-term government loan, Commerce compares the actual interest rate on the loan to a benchmark interest rate, which is calculated based on the methodologies established in Commerce's *Proposed Regulations*. *See Countervailing Duties; Notice of Proposed Rulemaking and Request for Public Comments*, 54 Fed.Reg. 23,365, 23,380 (to be codified at 19 C.F.R. § 355.44(b)) (hereinafter *"Proposed Regulations"*). In determining the applicable benchmark interest rate, Commerce considers whether the company which received the loan was creditworthy or uncreditworthy at the time it received the loan. Commerce includes a risk premium in the benchmark interest rate for companies that are determined to be uncreditworthy, whereas risk premiums are not included in the benchmark interest rate for creditworthy companies.

Once Commerce has determined the benchmark interest rate, it then must determine whether the company which received the loan obtained a countervailable benefit. To the extent a company's payments on a hypothetical loan made at the benchmark rate exceed the actual payments on the loan at issue, the company has received a countervailable benefit. Additionally, Commerce allocates the total amount of countervailable benefit over time, and determines the amount of the countervailable benefit allocable to the POI.

With respect to the determination at issue, Commerce concluded Usinor Sacilor received a countervailable benefit from certain long-term, fixed rate government loans. Some of these loans were obtained by Usinor Sacilor in years when it was creditworthy,[13] and other loans were obtained during a time in which it was uncreditworthy.[14] While the GOF's and Usinor Sacilor's questionnaire responses reported various national long-term interest rates commonly available in France, they did not identify which rate or rates would be appropriate for use as a benchmark interest rate.

During verification, Commerce examined two French banks in an effort to determine an appropriate benchmark interest rate. Because the two banks did not issue long-term, fixed rate loans, however, Commerce considered other available information on French interest rates prior to the issuance of the *Final Determination*, and concluded a long-term corporate interest rate published in the Organization for Economic Cooperation Development ("OECD") Monthly Financial Statistics for equipment loans made by Crédit National was an appropriate benchmark interest rate. Commerce used the Crédit National equipment loan rate as the basis for both creditworthy years (which call for the

---

**13.** In determining the benchmark interest rate for loan subsidy calculations in creditworthy years, Commerce's *Proposed Regulations* provide for the use of the average annual fixed interest rate for long-term loans (loans of one year or more in duration) commonly available to the firms in question in France. *See Proposed Regulations*, 54 Fed.Reg. at 23,380 (to be codified at 19 C.F.R. § 355.44(b)(4)(iv)).

**14.** In determining the benchmark interest rate for loan subsidy calculations in uncreditworthy years, Commerce's *Proposed Regulations* provide for the use of the highest annual fixed interest rate for long-term loans (loans of one year or more in duration) commonly available to the firms in question in France, plus a risk premium. *See Proposed Regulations*, 54 Fed.Reg. at 23,381 (to be codified at 19 C.F.R. § 355.44(b)(6)(iv)).

average long-term fixed rate in France) and uncreditworthy years (which call for the highest long-term fixed rate in France plus a risk premium). Commerce's investigation revealed that banks in France do not vary the interest rates charged to account for a customer's good standing or the risk associated with a loan.

### 2. *Discount Interest Rate*

In determining what portion of a countervailable grant or equity infusion is allocable to the POI, Commerce utilizes a discount rate which is adjusted depending on whether the company is creditworthy or uncreditworthy at the time it receives the benefit. Commerce determined Usinor Sacilor was uncreditworthy in each year in which it received a countervailable grant or equity infusion, and consistent with the methodology developed in *Final Affirmative Countervailing Duty Determination: Certain Hot Rolled Lead and Bismuth Carbon Steel Products From France*, 58 Fed.Reg. 6,221, 6,225 (Dep't Comm.1993) (final determ.) (*"France Bismuth "*), selected the long-term fixed rate it used as the benchmark interest rate for the discount interest rate.

### 3. *Inclusion of Usinor Sacilor's French–Produced Merchandise in the Sales Denominator*

Once Commerce has determined a countervailable subsidy exists, it calculates the per-unit subsidy rate by dividing the amount of the subsidy, decreased by certain offsets, by the appropriate portion of the subsidized firm's sales. Because Commerce determined the countervailable subsidies received by Usinor Sacilor were "tied" to its production in France, Commerce adjusted the sales denominator to include only sales of merchandise Usinor Sacilor produced in France, and to exclude sales of merchandise Usinor Sacilor produced outside of France.

At verification, Commerce determined the figures submitted by Usinor Sacilor for total sales of French-produced merchandise were accurate, with one exception. Commerce determined some of the sales Usinor Sacilor categorized as sales of French-produced merchandise were in fact re-sales of merchandise purchased from Usinor Sacilor's German group producers or resellers. Therefore, in calculating the final sales denominator, Commerce "excluded ... an amount equal to the value of sales made by Usinor Sacilor group companies outside France to Usinor Sacilor group companies within France. This sales value represents sales of foreign production and, therefore, must be excluded from the denominator." *General Issues Appendix,* 58 Fed.Reg. at 37,235.

### 4. *F.O.B. (Port) Value*

In calculating the sales denominator, Commerce endeavors to obtain the F.O.B. (port) value of the merchandise at issue. Usinor Sacilor, however, does not record F.O.B. (port) value in the regular course of business, and therefore it included two methodologies [15] in its questionnaire responses in an effort to assist Commerce in calculating an accurate F.O.B. (port) value for the French-produced sales. Following verification, Commerce concluded Usinor Sacilor had "attempted to provide the Department with as accurate an estimate as possible of its sales value based on F.O.B. (port)" and decided to "use[ ] the particular percentage provided in the [questionnaire] responses to derive the amount of transportation charges to be deducted from the sales value of French-produced merchandise." *General Issues Appendix,* 58 Fed.Reg. at 37,238.

### STANDARD OF REVIEW

■■■ In reviewing a final determination of the Commerce Department, this Court will sustain the determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (1988). Substantial evidence is that which " 'a reasonable mind might accept as adequate to support a conclusion.' " *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (citation omitted), quoted

---

**15.** One methodology estimated an F.O.B. (port) value by deducting transportation costs incurred by Usinor Sacilor outside of France, while the second methodology estimated an F.O.B. (port)

value by deducting a particular percentage of Usinor Sacilor's sales. *See General Issues Appendix,* 58 Fed.Reg. at 37,237.

in *Matsushita Elec. Indus. Co., Ltd. v. United States,* 3 Fed. Cir. (T) 44, 51, 750 F.2d 927, 933 (1984).

■ The Court must accord substantial weight to the agency's interpretation of the statute it administers. *American Lamb Co. v. United States,* 4 Fed. Cir. (T) 47, 54, 785 F.2d 994, 1001 (1986) (citations omitted). While Commerce has discretion in choosing one interpretation over another, "[t]he traditional deference courts pay to agency interpretation is not to be applied to alter the clearly expressed intent of Congress." *Board of Governors of the Fed. Reserve Sys. v. Dimension Fin. Corp.,* 474 U.S. 361, 368, 106 S.Ct. 681, 686, 88 L.Ed.2d 691 (1986), cited in *Ceramica Regiomontana, S.A. v. United States,* 10 CIT 399, 405, 636 F.Supp. 961, 966 (1986) ("[T]his Court will not allow an agency, under the guise of lawful discretion, to contravene or ignore the intent of the legislature or the guiding purpose of the statute."), *aff'd,* 5 Fed. Cir. (T) 77, 810 F.2d 1137 (1987). The Court is not to substitute its own determination for the agency's, but rather is to determine whether Commerce's determination is supported by substantial evidence on the record and is otherwise in accordance with law. *See, e.g., Consolo v. Federal Maritime Comm'n,* 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966) (noting "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence"); *Universal Camera Corp.,* 340 U.S. at 488, 71 S.Ct. at 465, 95 L.Ed. at 467–68 (1951) (the reviewing court may not "even as to matters not requiring expertise ... displace the [agency's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo* ").

## DISCUSSION

### PART I.

Plaintiffs raise the following ten challenges to the *Final Determination.*

### A. Usinor Sacilor's Equity Worthiness as of 1991

■ Inland Steel first argues Commerce's determination that Usinor Sacilor was equity worthy in 1991 is unreasonable and unsupported by record evidence. In advancing this argument, Inland Steel makes three assertions. First, plaintiffs maintain Commerce ignored precedent by refusing to rely on audited information obtained from Usinor Sacilor, and instead improperly based its analysis on a McKinsey & Company report which evaluated Usinor Sacilor's future prospects. Second, plaintiffs contend Commerce improperly delegated its responsibility by relying on the McKinsey report, which plaintiffs assert did not analyze potential investments in Usinor Sacilor according to the "reasonable investor" standard, and that Commerce improperly applied a cost-to-government standard in analyzing the report. Finally, plaintiffs assert Commerce unreasonably determined not to countervail other equity infusions received by Usinor Sacilor from the GOF in 1991, based on its determination Usinor Sacilor was equity worthy at that time.

Defendant responds "[a]lthough Commerce could not discuss its findings in detail in its final determination because significant evidence on which it relied ... was proprietary, its analysis, nevertheless, was fact-intensive and reflected a thorough consideration of the record evidence and points raised by the parties." (Def.'s Mem. in Opp'n to Pls.' and Def.-Intervs.' Mots. for J. on Agency R. ("Def.'s Br.") at 103.) In responding to Inland Steel's criticism that Commerce failed to explain which financial ratios were significant to its analysis, the government notes "the final determination shows that Commerce considered numerous relevant current and past financial ratios." (*Id.* at 104 (footnote omitted)). Additionally, in response to Inland Steel's criticism that ratios calculated using Usinor Sacilor's audited financial information did not support the conclusion a reasonable private investor would invest in Usinor Sacilor in 1991, the government observes "Commerce did not make a definitive conclusion at this point because its equity worthiness methodology requires it to consider ...

not only the relevant financial ratios, but also evidence ... regarding the future prospects of a firm." (*Id.* at 105 (citing *General Issues Appendix,* 58 Fed.Reg. at 37,244)). According to the government, Commerce concluded Usinor Sacilor was equity worthy in 1991, "only after considering and weighing not only the relevant financial rations but also the Swiss consulting report." (*Id.* at 106.)

The Court is not persuaded by plaintiffs' arguments. Initially, the Court notes the *Proposed Regulations* specify four criteria Commerce will consider in determining whether a company is equity worthy. Those criteria are:

(i) Current and past indicators of a firm's financial health calculated from that firm's statement and accounts ...;

(ii) Future financial prospects of the firm, including market studies, economic forecasts, and project or loan appraisals;

(iii) Rates of return on equity in the three years prior to the government equity infusion; and

(iv) Equity investment in the firm by private investors.

*Proposed Regulations,* 54 Fed.Reg. at 23,381 (to be codified at 19 C.F.R. § 355.44(e)(2)). The text of the *Final Determination* indicates Commerce considered both historical and forward-looking information in evaluating Usinor Sacilor's equity worthiness in 1991. *See Final Determination,* 58 Fed.Reg. at 37,306 (stating "we have looked to both the relevant financial data and the Swiss consulting report" in concluding Usinor Sacilor was equity worthy in 1991).

■ The Court rejects plaintiffs' assertion Commerce ignored audited financial information obtained from Usinor Sacilor and improperly based its determination on the McKinsey report. As noted above, the *Final Determination* specifically states Commerce reached its equity worthiness determination after evaluating both the financial data obtained from Usinor Sacilor and the McKinsey report. The Court finds Commerce's consideration of various financial ratios for Usinor Sacilor as well as the McKinsey report complies with the *Proposed Regulations.*

■ Additionally, the Court rejects Inland Steel's argument Commerce improperly delegated its responsibility by relying on the report, which plaintiffs assert utilizes a "cost-to-government" standard in evaluating Crédit Lyonnais' purchase of a twenty percent stake in Usinor Sacilor. The Court notes Commerce's decision to utilize information contained in the McKinsey report was made with considerable thought, and only after an independent review of the report's analysis and findings. *See* Memorandum from Julie Anne Osgood to Susan Kuhbach re: Equity worthy and Creditworthy Analysis of Usinor Sacilor, Def.-Interv.App., Tab 4 at 4–6 (hereinafter "Equity Worthy and Creditworthy Memorandum"). The Court also notes plaintiffs' assertion the McKinsey report does not analyze the transaction from the standpoint of a reasonable private investor in incorrect. The McKinsey report states quite plainly that it evaluated Crédit Lyonnais' acquisition of Usinor Sacilor shares from the perspective of a private investor. *See* McKinsey Report, Def.App., Tab 19 at 1 ("it is also a question of determining whether the acquisition of shares in Usinor Sacilor by Crédit Lyonnais corresponds to the action of a private investor who decides to make a contribution to risk capital by following criteria that identify normal conditions of a market economy"); *id.* at 9 ("The issue here is to determine whether an investor, regardless of whether he belongs to the public or private sector, could be interested in investing in the Group, based on objective criteria for making the decision, relevant to the normal conditions of a market economy.").

Additionally, the Court notes Commerce specifically examined whether the transaction between Crédit Lyonnais and Usinor Sacilor [ ] as plaintiffs contend. A memorandum prepared by Commerce analyzing Usinor Sacilor's equity worthiness and creditworthiness states

the consultants did consider whether there could be a [ ]. This is evident in their statement in the report that [ ].

Equity Worthy and Creditworthy Analysis of Usinor Sacilor, Def.-Intervs.App., Tab 4 at 5.

Finally, the Court rejects Inland Steel's argument that Commerce improperly failed

to countervail other equity infusions received by Usinor Sacilor in 1991. Based on the reasons discussed above, the Court finds Commerce's determination that Usinor Sacilor was equity worthy as of 1991 is supported by substantial evidence on the record and is otherwise in accordance with law, and accordingly Commerce appropriately determined not to countervail other equity infusions received by Usinor Sacilor in 1991.

### B. Benefits Received by Usinor Sacilor From PACS Outstanding During the POI

██ Commerce determined not to countervail the benefits Usinor Sacilor received from PACS prior to their conversion in 1991 stating

> [b]ecause we do not prorate equity benefits to correspond to the amount of time the equity was "outstanding" during the year of receipt, we can only countervail the equity portion of debt to equity conversions in the year of conversion. To do otherwise would lead to overcountervailing.

(Br. in Supp. of Pls.' R. 56.2 Mot. for J. Upon the Agency R. ("Pls.' Br.") at 27 (quoting *Final Determination*, 58 Fed.Reg. at 37,-312).) Plaintiffs challenge Commerce's decision not to countervail the benefits conferred by PACS which were outstanding during a portion of the POI, contending Commerce's determination is contrary to law. Plaintiffs argue certain PACS, converted to equity during the POI in March 1991, gave rise to two separate and countervailable subsidies, "one, a soft loan, benefitting the company for the first (approximately) two months of the POI, and the other, an equity infusion benefitting the company for the POI's last ten months." (*Id.* at 27.) Plaintiffs challenge Commerce's statement it was concerned about over countervailing, noting "the fact remains that the conversion was *not* countervailed. Thus, countervailing the benefit derived from the loans during part of the POI presents no risk of 'over countervailing.'" (*Id.* at 27.) Finally, plaintiffs assert the PACS were undisputedly inconsistent with commercial considerations, and thus satisfy the statute's definition of a subsidy upon which countervailing duties "shall" be imposed.[16]

In response, the government contends Commerce properly followed its "longstanding practice of valuing equity infusions ... as though they were in the possession of the recipient firm for the entire year of receipt regardless of when actually received during that year." (Def.'s Br. at 60.) The government asserts Commerce developed this methodology "principally for administrative convenience and because of the difficulty that it would encounter in trying to calculate subsidy benefits for varying periods of days rather than on a yearly basis." (*Id.* at 60–61.)

The Court notes while the methodology adopted and utilized by Commerce calculates the benefits received by companies on a yearly basis, and therefore arguably is not as precise as it might be in measuring benefits conferred on a company, Commerce's methodology is a reasonable means of carrying out the statute's mandate. In reviewing an agency's interpretation of a statute in which Congress has left a gap, this Court examines whether the agency's interpretation of the statute is reasonable. See *Chevron U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984) (stating "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency"). The Court finds Commerce's determination not to countervail the benefits received by Usinor Sacilor from the outstanding PACS during the first few months of 1991 is a reasonable interpretation of the statute and is supported by substantial evidence on the record and is otherwise in accordance with law. Accordingly, that portion of Commerce's *Final Determination* is sustained.

### C. Treatment of Stockholders' Advances as Grants

In the *Final Determination*, Commerce concluded the shareholders' advances received by Usinor and Sacilor between 1982 and 1986 were grants, noting "no shares

---

**16.** *See supra* n. 4.

were received [by the GOF] for them." *See Final Determination,* 58 Fed.Reg. at 37,307. Based on its conclusion the shareholders' advances were grants when provided, Commerce determined the countervailable event occurred when the advances were received by Usinor and Sacilor between 1982 and 1986. Plaintiffs challenge Commerce's determination, arguing the shareholders' advances were debt (not grants) when provided, and therefore, Usinor Sacilor's 1986 write-off of the debt created by the shareholders' advances was a countervailable event.

Plaintiffs assert "[t]he companies had no obligation to pay interest on the funds advanced, but were plainly obligated to repay the principal as they accounted for the [shareholders' advances] by creating a new 'liability' category on their balance sheets." (Pls.' Br. at 28 (footnote omitted).) Plaintiffs contend Commerce "significantly underval-ued[ ] the subsidy" as a result of its determination that "the [shareholders' advances] were grants when provided, rather than debt, and that the bestowal of these funds, not the 1986 write-off of the debt, constituted the subsidy." (*Id.* at 29 (citing *Final Determination,* 58 Fed.Reg. at 37,307).) Plaintiffs dispute Commerce's determination the shareholders' advances were grants at the outset, contending it is contrary to and not supported by record information. In support of its argument, plaintiffs note Usinor Sacilor has admitted: the shareholders' advances were debt; Usinor Sacilor did not record the shareholders' advances as "income" on its annual financial statements (even though its practice was to record donated funds not giving rise to liability as "income"); Usinor Sacilor converted the shareholders' advances in 1986 in order to avoid taxation associated with loan forgiveness; and French law and accounting practice provide shareholders' advances create debts and must be treated as loans, absent an explicit agreement to the contrary. According to the plaintiffs, "[t]he Department's determination was ... internally inconsistent; in its view, funds which were 'donated' to the companies by the GOF, and carried with them no liability at all, were later turned into equity (with a concomitant expectation of return) in the 1986–87 restructuring." (*Id.* at 32 (emphasis omitted).)

The government responds substantial evidence on the record supports Commerce's findings the shareholders' advances were nonrecurring grants at the time they were made. The government's brief specifically asserts "[t]here was no evidence of loan or repayment agreements, payment schedules or actual principal or interest payments being made, nor was there any other evidence tending to show that the GOF or Usinor Sacilor contemplated a repayment obligation." (Def.'s Br. at 64.) The government also challenges Inland Steel's assertion Usinor Sacilor did not treat the shareholders' advances as loans by accounting for them in a debt account, but rather "Usinor Sacilor listed [the shareholders' advances] in a hybrid debt/equity category." (*Id.* at 65.) Further, the government asserts "the listing is inconclusive, as it equally could be argued that the listing is an acknowledgment that the advances were considered to be equity instruments." (*Id.*)

Additionally, the government contends Commerce's determination the shareholders' advances were exceptional, and therefore nonrecurring, is supported by substantial record evidence. The government's brief asserts "[d]espite the fact that these advances were provided on a somewhat regular basis from 1982 to 1986, each advance required specific approval by the GOF." (*Id.* at 66–67.) The government also argues the shareholders' advances were exceptional because "they clearly did not represent a long-term solution to Usinor's and Sacilor's financial problems. Rather, the advances were given by the GOF merely to provide time for the development of a long-term solution." (*Id.* at 67.)

■ The Court is unpersuaded by plaintiffs' arguments. Despite plaintiffs' statement that Usinor Sacilor was "plainly obligated to repay the principal as they accounted for the [shareholders' advances] by creating a new 'liability' category on their balance sheet", (Pls.' Br. at 28), plaintiffs fail to point to any record evidence which definitively establishes the existence of a repayment obligation on the part of Usinor and Sacilor. Indeed, as defendant notes, the record contains "no evidence of loan or

repayment agreements, payment schedules or actual principal or interest payments being made, nor was there any other evidence tending to show that the GOF or Usinor Sacilor contemplated a repayment obligation." (Def.'s Br. at 64.)

The Court also finds unpersuasive Inland Steel's contention the shareholders' advances should be considered debt based on Usinor Sacilor's treatment of the advances on its balance sheets. In asserting Usinor Sacilor treated the shareholders' advances as "long-term debt", plaintiffs cite to materials prepared by Usinor Sacilor in responding to Commerce questionnaires in 1992. The Court notes, however, that contemporaneous financial statements and accompanying notes prepared by Usinor Sacilor between 1982 and 1985 classify the shareholders' advances as either contributions set aside for a future capital increase or as other equity. (See Mem. in Opp'n to Pls.' R. 56.2 Mot. for J. on the Agency R. ("Def.-Intervs.' Opp'n Br.") at 27.)

The Court additionally rejects Inland Steel's argument that Usinor Sacilor's conversion of the shareholders' advances to common stock in 1986 is inconsistent with its treatment of the advances as grants prior to the conversion. The Court finds Usinor Sacilor's conversion of the grants into common stock in 1986 was made pursuant to article 241 of the Law of July 24, which requires the maintenance of equity to stated capital ratio of one to two. The reclassification was necessary because article 241 counts only pure equity, not grants or quasi-equity, towards the mandatory ratio.

Finally, the Court rejects plaintiffs' contention that under French law shareholders' advances create debts and must be treated as loans. While French law may generally provide shareholders' advances create debts and must be treated as loans, the record evidence clearly establishes a different arrangement was reached between Usinor Sacilor and the GOF with respect to the shareholders' advances at issue in this case. The Court finds Commerce's determination the shareholders' advances received by Usinor Sacilor were grants when provided and that the countervailable event occurred in 1986 when the grants were converted to common stock is supported by substantial evidence on the record and is otherwise in accordance with law.

### D. *Provision of FDES Loans on Terms Consistent with Commercial Considerations*

The outstanding principal on two groups of FDES loans issued to Usinor Sacilor during the 1980s was consolidated on July 1, 1990 into two loan instruments which were outstanding during the POI. Commerce determined the consolidations "resulted in a different structure for the loan and a different interest rate", treated them as if they were new loans in 1990 and examined the consolidated loans to determine whether they were consistent with commercial considerations. *Final Determination,* 58 Fed.Reg. at 37,311. In the *Preliminary Affirmative Countervailing Duty Determinations: Certain Steel Products From France and Alignment of Final Countervailing Duty Determination: Certain Steel Products From France,* 57 Fed.Reg. 57,785 (Dep't Comm.1992) (prelim.determ.) ("*Preliminary Determination*"), Commerce determined the consolidated loans were countervailable. In the *Final Determination,* however, Commerce concluded the consolidated loans were not countervailable when compared with the benchmark interest rate.

A fourth challenge raised by plaintiffs asserts substantial record evidence does not support Commerce's determination that certain FDES loans on Usinor Sacilor's books during the POI were consistent with commercial considerations. According to plaintiffs, by utilizing the Crédit National equipment loan rate as the benchmark rate, Commerce committed three errors. First, plaintiffs contend Commerce abandoned, without explanation, its policy of using a nongovernment source of funding in selecting a benchmark interest rate. Additionally, plaintiffs assert Commerce improperly determined Crédit National loans are not countervailable. Finally, plaintiffs contend Commerce's determination that Crédit National's equipment loan rate reflects the cost of corporate long-term borrowing cannot

form the basis for Commerce's selection of a benchmark rate.

Defendant responds Commerce acted properly in selecting Crédit National's equipment loan rate as the benchmark rate in analyzing whether the consolidated loans were made at preferential rates. The government advances three arguments that Commerce acted properly. First, the government contends Commerce selected the highest long-term fixed interest rate from among the available evidence. The government contends plaintiffs are mistaken in asserting Commerce's selection of the Crédit National equipment loan rate as the benchmark interest rate failed to comply with Section 355.44(b)(6)(iv) of the *Proposed Regulations,* which requires the selection of the highest long-term fixed interest rate commonly available as the benchmark interest rate. The government asserts "record evidence showed that the [International Monetary Fund] rate included both short-term and long-term borrowing, while section 355.44(b)(6)(iv) directs Commerce to use a long-term interest rate." (Def.'s Br. at 112 (footnote omitted).) The government notes Commerce's selection of Crédit National's equipment loan rate satisfied the *Proposed Regulations,* because it "reflected exclusively 'the cost of corporate long-term borrowing.'" (*Id.* at 112–13 (citing *Final Determination,* 58 Fed.Reg. at 37,314)).

Second, the government asserts Commerce's selection of Crédit National's equipment loan rate is consistent with Commerce's past practice. Initially, the government notes "Inland Steel does not cite to any Commerce cases to support its characterization of Commerce's past practice," and continues on to note "[a] review of relevant Commerce cases ... shows that Commerce frequently uses rates based on government-owned bank loans, ... provided that the program from which the loans originate is not ... specific." (*Id.* at 113.) Because Commerce did not determine the Crédit National equipment loans were specific, the government contends Commerce's "use [of] the rates on [Crédit National's equipment] loans as possible benchmark interest rates" was consistent with its past practice and was

supported by substantial evidence on the record and otherwise in accordance with law. (*Id.* at 114.)

Finally, the government contends Commerce properly selected a country-wide rate for use as the benchmark interest rate. The government contends Inland Steel's assertion that Commerce erred by utilizing the Crédit National equipment loan rates because those rates were not companyspecific is without merit. The government notes Commerce's statement in the *Preliminary Determination* that "Usinor Sacilor did not report its actual cost for long-term fixed-rate debt", *Preliminary Determination,* 57 Fed.Reg. at 57,787, and asserts the *Proposed Regulations* direct Commerce to utilize a long-term, fixed interest rate commonly available in France. Therefore, "when Commerce eventually selected the Crédit National equipment loan rates as the benchmark interest rates (in the final determination), it was not attempting to find a company-specific rate", but rather "Commerce was attempting to find a country-wide rate, regardless of whether Usinor Sacilor had access to it." (Def.'s Br. at 115.)

██ The Court is not persuaded by plaintiffs' arguments. First, the Court notes the *Proposed Regulations* state that in selecting a benchmark rate, "[w]here necessary, ... the Secretary may use loans made available under one or more government programs, provided that any such program is not deemed to be selective." *Proposed Regulations,* 54 Fed.Reg. at 23,281 (to be codified at 19 C.F.R. § 355.44(b)(7)). In the *Final Determination,* Commerce found the Crédit National equipment loan rates "to be more consistent with our Regulations than either the IMF or the PIBOR rates because they reflect the cost of corporate long-term borrowing", *Final Determination,* 58 Fed. Reg. at 37,314, indicating Commerce considered non-government sources of financing in calculating a benchmark interest rate, but concluded the Crédit National equipment loan rates were more appropriate for use in calculating the benchmark rate. Additionally, the Court notes Commerce determined the IMF rates were inappropriate for use as a benchmark interest rate because they included both short- and long-term interest

rates, contrary to the *Proposed Regulations*. *See* Preliminary Determination Disclosure Documents, Def.App. Tab 11, attachment; *Proposed Regulations*, 54 Fed.Reg. at 23,381 (to be codified at 19 C.F.R. § 355.44(b)(6)(iv)).

Additionally, the Court rejects Inland Steel's contention the methodology utilized by Commerce in the *Final Determination* departed improperly from its past practice. The Court observes Commerce's utilization of rates based on non-specific government-owned bank loans in the *Final Determination* does not represent the first time Commerce has utilized such rates. *See, e.g., Final Affirmative Countervailing Duty Determination; Industrial Phosphoric Acid from Israel,* 52 Fed.Reg. 25,447, 25,448–49, 25,452 (Dep't Comm.1987); *Final Affirmative Countervailing Duty Determination and Countervailing Duty Order; Certain Frest (sic) Cut Flowers from Ecuador,* 52 Fed.Reg. 1,361, 1,364, 1,366–67 (Dep't Comm.1987). The Court finds not only is Commerce's utilization of the Crédit National equipment loan rate consistent with its past practice, but it also is consistent with the requirements established in the *Proposed Regulations.*

Second, the Court rejects Inland Steel's contention the Crédit National equipment loan rates cannot be used in calculating a benchmark interest rate because those loans are specific, and thus violate the *Proposed Regulations'* condition that loans made available under government programs that are "deemed to be selective" cannot be used in calculating a benchmark interest rate. *Proposed Regulations*, 54 Fed.Reg. at 23,381 (to be codified at 19 C.F.R. § 355.44(b)(7)). This matter is discussed more fully below. *See infra* Part I.F.

 Finally, the Court rejects Inland Steel's assertion that Commerce improperly utilized the Crédit National equipment loan rates in calculating a benchmark interest rate based on its determination the Crédit National rates "reflect the cost of corporate long-term borrowing", *Final Determination*, 58 Fed.Reg. at 37,314, is an inappropriate basis for the selection of a benchmark interest rate. The Court notes the *Proposed Regulations* establish a two-track approach to selecting a benchmark interest rate, differentiating between calculating a company-specific benchmark rate and a country-wide benchmark rate. *See Proposed Regulations,* 54 Fed.Reg. at 23,380 (to be codified at 19 C.F.R. § 355.44(b)(4)(i)–(iii) (providing for the calculation of a company-specific benchmark interest rate based on a loan taken out, or a debt obligation issued, "by the firm receiving the government loan"); § 355.44(b)(4)(iv)–(v) (providing for the calculation of a country-wide benchmark interest rate based on "[t]he national" long-term fixed or variable interest rate "in the country in question")). Because "Usinor Sacilor did not report its actual cost for long-term fixed-rate debt", *Preliminary Determination,* 57 Fed. Reg. at 57,787, Commerce calculated a benchmark interest rate based on the country-specific provisions set out in the *Proposed Regulations.*

Contrary to plaintiffs' contention Commerce improperly selected Crédit National's equipment loan rate as a benchmark based on its observation those rates "reflect the cost of corporate long-term borrowing", the Court finds this is the type of consideration the *Proposed Regulations* intended Commerce to undertake. As plaintiffs note "the very purpose of selecting a benchmark interest rate is to estimate the loan recipient's alternative (unsubsidized) cost of loan capital." (Pls.' Br. at 35.) The Court observes that in determining the Crédit National equipment loan rates "reflect the cost of corporate long-term borrowing", Commerce is complying with the *Proposed Regulations'* direction that a country-specific rate be utilized where a company-specific rate is unavailable. Accordingly, the Court rejects plaintiffs' challenges and finds Commerce's use of Crédit National's equipment loan rates as the benchmark interest rate in evaluating whether the FDES loans consolidated in 1990 were countervailable is supported by substantial evidence on the record and is otherwise in accordance with law.

E. *Benefits Received by Usinor Sacilor From CFDI Loans*

Plaintiffs next contest Commerce's calculation of the benefits conferred upon Usinor

Sacilor by loans issued by the Caisse Francaise de Developpement Industriel ("CFDI"). Plaintiffs raise four specific objections concerning Commerce's actions with respect to this portion of the investigation.

1. *Commerce's Selection of A[ ] to Calculate the Benefits Conferred Upon Usinor Sacilor*

The first objection raised by plaintiffs asserts Commerce improperly selected [ ]. According to plaintiffs, Commerce calculated the benefits certain CFDI loans conferred upon Usinor Sacilor using its [ ], in both the *France Bismuth* investigation and the *Preliminary Determination*. Plaintiffs assert Commerce's application of its [ ] departs without any explanation from its prior methodology, and therefore must be remanded because "[w]hile the Department is permitted to change its methodology, it may not apply an utterly new methodology, which could not possibly have been anticipated during the investigation, without explaining why." (Pls.' Br. at 41 (footnote omitted).)

The defendant responds Commerce properly analyzed the CFDI loans given the record evidence. According to the defendant, in analyzing the CFDI loans, Commerce "applied [ ]" because "Commerce was able to identify and verify [ ], [and] it would have been inappropriate for Commerce to use [ ]." (Def.'s Br. at 72, 73.) Defendant also responds to plaintiffs' assertion that Commerce acted inconsistently by [ ] in the *France Bismuth* investigation and not in the investigation presently under review. According to the defendant, "Commerce was unable to [ ] [in the *France Bismuth* investigation] because 'respondents did not provide legible repayment schedules.'" (*Id.* at 73.)

The Court rejects plaintiffs' contention Commerce improperly applied its [ ] in measuring the countervailable benefits conferred on Usinor Sacilor by the CFDI loans. While plaintiffs note Commerce applied its [ ] in the *France Bismuth* investigation and the *Preliminary Determination,* they fail to note Commerce [ ] because "respondents did not provide legible repayment schedules" for the CFDI loans. *See* Final

Determination Concurrence Memorandum, Def.App. Tab 16 at 20. The Court finds Commerce's identification and verification of [ ] of the CFDI loans makes Commerce's application of its [ ] appropriate. *See* Company Verification Report, Def. App. Tab 1 at 29; Supplemental Company Response, Def.App. Tab 7, Ex. 12–A, ¶ I. Moreover, the Court notes the [ ] was not, as plaintiffs contend, an "utterly new methodology", (Pls.' Br. at 41), but rather was a methodology established in the *Proposed Regulations,* the application of which was justified based on the information obtained during verification. The Court finds Commerce's application of its [ ] in measuring the countervailable benefits conferred on Usinor Sacilor by the CFDI loans is supported by substantial evidence on the record and is otherwise in accordance with law.

2. *Commerce's [ ]*

Plaintiffs' second challenge to Commerce's calculations of the benefits conferred upon Usinor Sacilor by certain CFDI loans asserts Commerce erred by [ ]. According to plaintiffs, these [ ]. (Pls.' Br. at 42.) Plaintiffs also argue Commerce erroneously departed from the methodology applied in the *Preliminary Determination* and the *France Bismuth* investigation by [ ] in the *Final Determination.* Finally, plaintiffs contend even though [ ]. (*Id.* at 43.)

In response, defendant quotes Commerce's verification report which notes[ ]. (Def.'s Br. at 74 (quoting Company Verification Report, Def.App. Tab 1 at 30)). Additionally, defendant asserts it is Commerce's practice to allocate interest payments to the year in which they are actually made. Finally, defendant rejects plaintiffs' argument Commerce treated the payments inconsistently in the *France Bismuth* investigation and the *Preliminary Determination.* Defendant asserts "Commerce did treat [ ]" in the *France Bismuth* investigation. (*Id.* at 75.)

The Court rejects plaintiffs' arguments. First, the Court notes plaintiffs' assertion that Commerce did not [ ] in the *France Bismuth* investigation and the *Pre-*

*liminary Determination* is incorrect. The Court notes Commerce did count Usinor Sacilor's [ ].[17]

Second, the Court rejects Inland Steel's contention that the [ ] (Pls.' Br. at 43 (emphasis omitted).) The Court observes the arrangement by which the GOF and Usinor Sacilor agreed Usinor Sacilor would make [ ] was in the form of an amendment of [ ] CFDI loans. The Court finds Commerce's treatment of the [ ] attached to the CFDI loans as [ ] on the CFDI loans was reasonable, is supported by substantial evidence on the record and is otherwise in accordance with law.

Finally, the Court rejects plaintiffs' argument that [ ]. The Court finds Commerce's allocation of [ ] is consistent with Commerce's past practice and the *Proposed Regulations.* The Court notes the *Proposed Regulations* explicitly state in calculating the benefits conferred upon a company, Commerce determines [ ]. Additionally, the Court notes Commerce's allocation of [ ] is consistent with its practice in past investigations. *See, e.g., Final Affirmative Countervailing Duty Determination and Countervailing Duty Order; Carbon Steel Butt-weld Pipe Fittings from Thailand,* 55 Fed.Reg. 1,695, 1,697 (Dep't Comm.1990); *Final Affirmative Countervailing Duty Determination and Partial Countervailing Duty Order; Ball Bearings and Parts Thereof from Thailand; Final Negative Countervailing Duty Determinations: Antifriction Bearings (Other Than Ball or Tapered Roller Bearings) and Parts Thereof From Thailand;* 54 Fed.Reg. 19,130, 19,132 (Dep't Comm. 1989). Accordingly, the Court finds Commerce's allocation of [ ] is supported by substantial evidence in the record and is otherwise in accordance with law.

3. *Commerce's Verification of* [ ]

A third challenge raised by plaintiffs asserts Commerce erred by "[ ] without

verifying that this had indeed happened." (Pls.' Br. at 44 (footnote omitted).) Plaintiffs assert Usinor Sacilor, which reported [ ], would have also reported [ ]. Plaintiffs argue despite the fact that Usinor Sacilor [ ], Commerce "[ ]." (*Id.* at 45.) Plaintiffs contend Commerce's failure to base this calculation on verified evidence requires a remand.

Commerce responds that in measuring the benefit arising from the CFDI loans, Commerce "[ ]" and that this calculation was "[ ]." (Def.'s Br. at 78.) Defendant's response continues on to assert "Commerce did not attempt to [ ]," but rather "in accord with its consistent and longstanding practice, it treated [ ]." (*Id.* at 78.)

The Court rejects plaintiffs' argument Commerce failed to verify that [ ]. The Court believes Inland Steel's characterization misstates Commerce's methodology, and notes Commerce did not [ ]. Rather, Commerce treated the [ ]. As previously noted, the Court finds Commerce's methodology is supported by substantial evidence on the record and is otherwise in accordance with law.

4. *Commerce's Use of Crédit National Equipment Loan Rates as the Benchmark Loan Rate to Countervail Certain CFDI Loans*

Finally, plaintiffs argue Commerce's decision to use Crédit National equipment loan rates in setting the benchmark interest rate used to calculate the benefits conferred on Usinor Sacilor by the CFDI loans is unsupported by record evidence and is not in accordance with law. Because the Court has addressed this contention in considerable detail, *see infra* Part I.G., the Court will not repeat its discussion.

F. *Specificity of Loans Usinor Sacilor Received from Crédit National*

■ Plaintiffs continue their challenge of the *Final Determination,* asserting Com-

---

**17.** The Court notes the administrative record in the *France Bismuth* determination is not part of the administrative record of the case presently under review. Those records, however, are on file with the Court and were reviewed in order to determine the accuracy of Inland Steel's characterization of the *France Bismuth* investigation.

*See, e.g., Win-Tex Products, Inc. v. United States,* 17 CIT 786, 789, 829 F.Supp. 1349, 1352 (1993) (noting "indisputable facts like the agency's own prior determinations may be judicially noticed by the court when such notice is requested by a party and is otherwise appropriate").

merce erred when it failed to countervail certain industry-specific loans from Crédit National which benefitted Usinor Sacilor during 1991. Plaintiffs raise four specific challenges to Commerce's treatment of Crédit National's loans to Usinor Sacilor which are discussed in more detail below.

### 1. Commerce's Prior Determinations Addressing the Specificity of Crédit National's Loans

Plaintiffs contend Commerce's *Final Determination* "reverse[s], without any explanation, earlier determinations with respect to the specificity of Credit National loans generally and Credit National loans to the French steel industry in particular during the relevant period (1977–1987)." (Pls.' Br. at 47 (emphasis omitted).) [18] Plaintiffs assert Commerce's failure to explain "what was incorrect about these earlier determinations or even what prompted their reconsideration in the first place" and "how its new specificity ruling is consistent with, or even remotely connected to, facts in the record" requires a remand for Commerce to address these issues. (*Id.* at 48, 49 (footnote omitted).)

Commerce responds "[i]t is well-established that Commerce's findings in a particular case are not binding on it in a subsequent case. Rather, Commerce's findings in a particular case must be based solely on the facts in the administrative record of that case, regardless of the findings made in an earlier case." (Def.'s Br. at 84.) Defendant goes on to note, at least with respect to Commerce's finding of specificity in *Final Affirmative Countervailing Duty Determinations; Certain Steel Products From France,* 47 Fed.

Reg. 39,332, 39,334 (Dep't Comm.1982) (final determ.) ("*Certain Steel Products*"), Commerce "found these loans to be specific not because the proffered evidence lacked probity, but rather because the GOF had not cooperated at verification." (*Id.* at 85.) Defendant contrasts this with the determination presently under review in which "Usinor Sacilor submitted probative evidence of general availability, and Commerce verified this information." (*Id.* at 86.)

■ The Court rejects plaintiffs' arguments. The Court notes only Commerce's 1982 *Certain Steel Products* determination cited by Inland Steel is relevant to evaluating whether the Crédit National loans at issue are specific.[19] The Court also notes Commerce's determination that Crédit National loans were specific in the 1982 *Certain Steel Products* determination was a result of the GOF's failure to fully respond to Commerce's inquiries at verification. *See Certain Steel Products,* 47 Fed.Reg. at 39,334 (noting Commerce's request to meet with Crédit National officials was denied and as a result Commerce was "unable to establish that these loans ... are generally available"). With respect to the present investigation, however, the record contains verified information supporting Commerce's determination that Crédit National loans are generally available. *See Final Determination,* 58 Fed. Reg. at 37,311 (noting "Credit National's Annual Reports demonstrate that loans in these years were in fact provided to numerous sectors and were not disproportionately provided to the steel industry.")

---

**18.** The three determinations cited by plaintiffs in support of this assertion are *Final Affirmative Countervailing Duty Determination; Brass Sheet and Strip From France,* 52 Fed.Reg. 1,218, 1,221 (Dep't Comm.1987) (final determ.); *Final Affirmative Countervailing Duty Determination; Industrial Nitrocellulose from France,* 48 Fed.Reg. 11,971, 11,974–75 (Dep't Comm.1983) (final determ.); *Final Affirmative Countervailing Duty Determinations; Certain Steel Products From France,* 47 Fed.Reg. 39,332, 39,334 (Dep't Comm.1982) (final determ.) ("*Certain Steel Products*").

**19.** The plaintiffs' references to Commerce's determination in *Final Affirmative Countervailing*

*Duty Determination; Industrial Nitrocellulose From France,* 48 Fed.Reg. 11,971 (Dep't Comm. 1983) (final determ.) and *Final Affirmative Countervailing Duty Determination; Brass Sheet and Strip From France,* 52 Fed.Reg. 1,218 (Dep't Comm.1987) (final determ.) are misplaced. In the *Industrial Nitrocellulose* investigation, Commerce determined the Crédit National loan at issue "was of the 'ordinary' type and made on commercial terms", 48 Fed.Reg. at 11,975, while in the *Brass Sheet* investigation Commerce determined one of the Crédit National loans to be specific only because it was an export loan. 52 Fed.Reg. at 1,221.

### 2. *Classification of All Crédit National Loans Within a Single Program*

Plaintiffs also challenge Commerce's alleged failure to "identify the 'program' under which Usinor–Sacilor's loans were provided." (Pls.' Br. at 50.) Plaintiffs contend Commerce's analysis with respect to whether the Crédit National loans were *de jure*[20] or *de facto*[21] specific cannot be sustained by this Court. According to plaintiffs, "it is unreasonable and wholly inconsistent with the Department's precedents to treat everything such an institution does as a single program." (*Id.* at 51.)

Defendant responds the program investigated by Commerce is this case was limited to loans originated by Crédit National. As for plaintiffs' assertion Commerce improperly consolidated certain Crédit National activities into a single program, defendant responds "[t]he FDES, CFDI and ECSC loans are not included in [the charts verified by Commerce]—nor in the Crédit National program being investigated here—because Crédit National did not originate them; rather, Crédit National merely *administers* them." (Def.'s Br. at 89.)

■ The Court rejects plaintiffs' arguments. The Court notes the record contains verified information establishing the charts provided to and relied on by Commerce in concluding Crédit National loans are nonspecific include only information on loans originated by Crédit National. *See* GOF Verification Report, Def.App. Tab 4 at 12–13. The other loans noted by plaintiffs, such as the FDES, CFDI, and ECSC loans, are administered by Crédit National but are not included in the figures upon which Commerce relied. *See id.* Based on the fact

Commerce considered only loans originated by Crédit National, the Court finds Commerce properly classified the loans as constituting a single program.

### 3. *Provision of Benefits to a Specific Industry of Enterprise of Group Thereof*

Plaintiffs' third challenge with respect to the CFDI loans asserts Commerce failed to determine whether a specific industry or enterprise or group of industries or enterprises were provided with subsidy benefits.[22] Plaintiffs maintain the charts reflecting Crédit National's loan exposure in various years, which Commerce relied on in determining the CFDI loans were *de facto* nonspecific, are deficient. First, plaintiffs claim "the source documents for these charts, including particularly the types of loans included and the laws under which they were issued, were not placed on the record or examined by the Department" (Pls.' Br. at 53), and as a result Commerce "had no way of knowing the contents and methodology of the 'pie chart' loan breakouts or the types of Credit National loans whose distribution they purportedly reflect, or the nature of the programs under which loans were made." (*Id.* at 54.) Plaintiffs also claim Commerce failed to place on the record information useful for identifying the program under which the loans were made to Usinor Sacilor.

Finally, plaintiffs argue even if the previous two challenges are rejected, Commerce "did not perform a *de facto* specificity analysis as required by law and its *Proposed Regulations*." (Pls. Br. at 54.) In particular, plaintiffs focus their challenge on the

---

**20.** With respect to Commerce's *de jure* specificity analysis, plaintiffs note Commerce "cited only the law under which Credit National was *created*—not the many other laws pursuant to which it made, and continues to make, loans to different kinds of borrowers." (Pls.' Br. at 50.)

**21.** With respect to Commerce's *de facto* analysis, plaintiffs contend "the Department made a broad and unsupported assumption that *all* Credit National loans for the period in question were part of a single program for purposes of specificity analysis." (Pls.' Br. at 51.)

**22.** The statute provides that in determining whether a subsidy is present, Commerce

shall determine whether the bounty, grant, or subsidy in law or in fact *is provided to a specific enterprise or industry, or group of enterprises or industries.* Nominal general availability, under the terms of the law, regulation, program, or rule establishing a bounty, grant, or subsidy, of the benefits thereunder is not a basis for determining that the bounty, grant, or subsidy is not, or has not been, in fact provided to a specific enterprise or industry, or group thereof.

19 U.S.C. § 1677(5)(B) (1988) (emphasis added).

fourth element in Commerce's *de facto* specificity analysis as set out in the *Proposed Regulations. See Proposed Regulations,* 54 Fed.Reg. at 23,379 (to be codified at 19 C.F.R. § 355.43(b)(2)(iv)) (providing Commerce will consider "the extent to which a government exercises discretion in conferring benefits under a program"). Plaintiffs assert Commerce's specificity findings in the *Final Determination* are inconsistent with its findings in *Final Affirmative Countervailing Duty Determination; Brass Sheet and Strip From France,* 52 Fed.Reg. 1,218, 1,221 (Dep't Comm.1987) (final determ.) and *Final Affirmative Countervailing Duty Determination; Carbon Steel Wire Rod From France,* 47 Fed.Reg. 42,422, 42,423 (Dep't Comm.1982) (final determ.), where according to plaintiffs, Commerce determined "the GOF exercises near-total control in determining who gets loans from Credit National and on what terms." (Pls. Br. at 55.)

Defendant responds by `asserting Commerce's analysis of the GOF's exercise of its discretion is "subsumed within Commerce's finding regarding the actual distribution of Crédit National loans by and within sectors. This evidence shows how the GOF exercised its discretion." (Def.'s Br. at 90.) Defendant's brief continues on to discuss the Court of Appeals for the Federal Circuit's opinion in *PPG Industries, Inc. v. United States,* 978 F.2d 1232, 1241 (Fed.Cir.1992), asserting it stands for the proposition that "the governmental discretion factor listed in the Proposed Regulations is not concerned so much with the existence of governmental discretion, but rather with how that governmental discretion is exercised." (Def.'s Br. at 91.) According to defendant, record evidence "shows that the GOF exercised its discretion to provide Crédit National loans on a non-specific basis." (*Id.*)

▬ The Court rejects plaintiffs' argument Commerce improperly relied upon the Crédit National Annual Reports because the source documents supporting the Annual Reports were not on the record. The Court observes the data contained in the Annual Reports are especially reliable based on their being audited by an independent accounting firm. Commerce regularly accepts independently audited data for verification purposes. *See, e.g., France Bismuth,* 58 Fed.Reg. at 6,227; *Final Affirmative Countervailing Duty Determination; Steel Wire Rope from India,* 56 Fed.Reg. 46,292, 46,294 (Dep't Comm.1991); *Final Negative Countervailing Duty Determination: Industrial Belts and Components and Parts Thereof, Whether Cured or Uncured, From the Republic of Korea,* 54 Fed.Reg. 15,513, 15,516 (Dep't Comm.1989).

▬ Additionally, the Court rejects plaintiffs' contention Commerce failed to consider "the extent to which [the GOF] exercises discretion in conferring benefits [through Crédit National loans]." *Proposed Regulations,* 54 Fed.Reg. at 23,379 (to be codified at 19 C.F.R. § 355.43(b)(2)(iv)). As noted above, the Court finds Commerce's determination that Crédit National loans are non-specific is supported by substantial evidence on the record and is otherwise in accordance with law. Because the Court has sustained Commerce's determination regarding the specificity of Crédit National's loans, the Court finds the existence of any governmental discretion is irrelevant.

### 4. Commerce's Failure to Countervail Export Subsidies

Plaintiffs' final challenge with respect to Commerce's finding certain CFDI loans are countervailable asserts Commerce improperly departed from prior practice by failing to countervail a loan discovered during verification which was used to promote exports. Plaintiffs claim because "export subsidies are *per se* selective," (Pls.' Br. at 57 (citing *Proposed Regulations,* 54 Fed.Reg. at 23,379 (to be codified at 19 C.F.R. § 355.43(a)(1)))), Commerce's failure to countervail the export promotion loans discovered at verification requires a remand.

Defendant responds "[a]fter reviewing Inland Steel's argument and the record of this case, Commerce has discovered that it inadvertently failed to find certain Crédit National loans to be specific", (Def.'s Br. at 92), and accordingly requests this Court remand the matter. Defendant asserts that on remand "Commerce ... will determine whether to countervail these loans after examining ...

whether the loans conferred a benefit upon Usinor Sacilor." (*Id.* at 93.)

 The Court finds defendant's request for a remand is reasonable and plaintiffs are correct in asserting Commerce's determination not to countervail certain loans, discovered at verification, used to finance export activities requires a remand. *See Proposed Regulations,* 54 Fed.Reg. at 23,379 (to be codified at 19 C.F.R. § 355.43(a)(1) (stating "Selective treatment, and a potential countervailable export subsidy, exists where the Secretary determines that eligibility for, or the amount of, benefits under a program is tied to actual or anticipated exportation or export earnings.")). Accordingly, the Court will remand this portion of the *Final Determination* for Commerce to determine whether any countervailable benefits were conferred upon Usinor Sacilor by these loans. With the exception of the remand on this issue, however, the Court finds the *Final Determination*'s conclusion that Crédit National loans are non-specific is supported by substantial evidence on the record and otherwise in accordance with law.

### G. Use of Crédit National's Equipment Loan Rates In Calculating Usinor Sacilor's Benchmark and Discount Rates

A seventh challenge raised by plaintiffs to the *Final Determination* asserts Commerce improperly utilized Crédit National equipment loan rates in calculating Usinor Sacilor's benchmark and discount rates, and as a result vastly undervalued the benefits various countervailable grants and loans conferred upon Usinor Sacilor. Plaintiffs assert Commerce improperly departed from the benchmark and discount rates used in the *Preliminary Determination,* and erred by utilizing the rates Crédit National charged to borrowers obtaining equipment loans in calculating the benchmark and discount rates in the *Final Determination.*

Inland Steel raises three objections to Commerce's utilization of Crédit National's equipment loan rates in calculating a benchmark interest rate to determine whether certain loans received by Usinor Sacilor were countervailable. First, plaintiffs allege Com-

merce unreasonably departed from its *Proposed Regulations,* which require the use of the *"highest* long-term fixed interest rate commonly available to firms in the country in question" in calculating the benchmark and discount rates for an uncreditworthy company, when it utilized Crédit National's equipment loan rate in the *Final Determination.* (*See* Pls.' Br. at 60 (citing *Proposed Regulations,* 54 Fed.Reg. at 23,381 (to be codified at 19 C.F.R. § 355.44(b)(6)(iv)(A)(1)))). According to Inland Steel, Commerce erred by failing to apply a series of French long-term interest rates published by the International Monetary Fund ("IMF"), which Commerce utilized in the *France Bismuth* investigation and in the *Preliminary Determination.* Plaintiffs also assert Commerce failed to comply with its past practice and the *Proposed Regulations* by utilizing a government source of financing in selecting a benchmark interest rate for Usinor Sacilor, noting "Credit National ... is owned by, and makes its lending decisions wholly at the direction of, the GOF." (*Id.* at 62.) Finally, Inland Steel asserts Commerce acted improperly in utilizing Crédit National's equipment loan rate because "there is no evidence in the record that Usinor Sacilor had access to these loans," (*id.* at 64 (emphasis omitted)), and therefore the Crédit National equipment loan rates cannot serve as an accurate measure of whether Usinor Sacilor received loans on terms inconsistent with commercial considerations.

Second, plaintiffs allege Commerce acted contrary to its long-standing practice and *Proposed Regulations* in utilizing Crédit National's equipment loan rates to calculate Usinor Sacilor's discount rate, which was used in determining whether certain grants received by Usinor Sacilor were countervailable. Plaintiffs argue Commerce should have used the "highest long-term fixed interest rate commonly available to firms in the country in question." (Pls.' Br. at 66 (citing *Proposed Regulations,* 54 Fed.Reg. at 23,381 (to be codified at 19 C.F.R. § 355.44(b)(6)(iv)(A)(1)))).

Defendant responds Commerce did not select the IMF rates, which "include both short-term and long-term borrowing", be-

cause "it was not the most appropriate rate within the meaning of section 355.44(b)(6)(iv)." (Def.'s Br. at 112.) Defendant also notes "Commerce frequently uses rates based on government-owned bank loans, ... provided that the program from which the loans originate is not selective." (*Id.* at 113.) Finally, defendant argues Commerce's utilization of Crédit National's equipment loan rate as a country-specific benchmark rate should be sustained because Usinor Sacilor failed to report its actual cost for long-term fixed-rate debt, leaving Commerce with no choice but to utilize a country-specific rate. (*Id.* at 115.)

■ The Court rejects plaintiffs' arguments. First, with respect to plaintiffs' contention Commerce erred by failing to utilize the IMF lending rates, the Court notes the *Proposed Regulations* specifically state Commerce shall use "[t]he highest long-term fixed interest rate commonly available to firms in the country in question" in calculating the benchmark interest rate. *See Proposed Regulations,* 54 Fed.Reg. at 23,381 (to be codified at 19 C.F.R. § 355.44(b)(6)(iv)(A)(1)). The Court notes Commerce determined it would be inappropriate to use the IMF rates because they include "both short-term and long-term borrowing", (*id.* at 112), and therefore do not fully satisfy the *Proposed Regulations.* Accordingly, the Court finds Commerce's determination not to utilize the IMF rates in calculating the benchmark interest rate for Usinor Sacilor is supported by substantial evidence on the record and is otherwise in accordance with law.

The Court also finds Commerce's use of a loan rate from a government-owned bank is appropriate. The *Proposed Regulations* provide Commerce may use government rates "[w]here necessary" and when the government loans are determined to be non-specific. *See Proposed Regulations,* 54 Fed.Reg. at 23,381 (to be codified at 19 C.F.R. § 355.44(b)(7)). Additionally, the Court notes the *Final Determination*'s utilization of government-owned bank loan rates as a benchmark rate is consistent with Commerce's past practice. *See, e.g., Final Affirmative Countervailing Duty Determination;*

*Industrial Phosphoric Acid from Israel,* 52 Fed.Reg. 25,447, 25,448–49, 25,452 (Dep't Comm.1987); *Final Affirmative Countervailing Duty Determination and Countervailing Duty Order; Frest (sic) Cut Flowers from Ecuador,* 52 Fed.Reg. 1,361, 1,364, 1,366–67 (Dep't Comm.1987). Accordingly, the Court finds Commerce's utilization of Crédit National's equipment loan rate in calculating Usinor Sacilor's benchmark interest rate is supported by substantial evidence on the record and is otherwise in accordance with law.

■ Finally, the Court rejects plaintiffs' arguments Commerce improperly utilized the Crédit National equipment loan rate as a benchmark interest rate because there was no evidence in the record that Usinor Sacilor had access to those loans. The Court finds the *Proposed Regulations* establish a two-track system through which Commerce may either select a company-specific rate, *see Proposed Regulations,* 54 Fed.Reg. 23,380 (to be codified at 19 C.F.R. § 355.44(b)(4)(i)– (iii)), or a country-specific rate to serve as a surrogate for the company-specific rate when company-specific information is either not available or not in the record. *See Proposed Regulations,* 54 Fed.Reg. at 23,380 (to be codified at 19 C.F.R. § 355.44(b)(4)(iv)–(v)). In the *Preliminary Determination,* Commerce noted "Usinor Sacilor did not report its actual cost for long-term fixed-rate debt." *Preliminary Determination,* 57 Fed.Reg. at 57,787. Because there was no company-specific information in the record, the Court finds Commerce properly elected to utilize a country-specific interest rate in its calculations of a benchmark interest rate for Usinor Sacilor.

■ With respect to plaintiffs' assertions Commerce improperly utilized Usinor Sacilor's benchmark interest rate as the discount interest rate, the Court finds it has been Commerce's practice to utilize the benchmark interest rate as the discount rate for uncreditworthy companies. *See infra* Part II.C. The Court discusses this practice more fully below, and finds Commerce's utilization of the Crédit National equipment loan rate as the underlying rate in calculating the uncreditworthy discount rate for Usinor Sacilor is

supported by substantial evidence on the record and is otherwise in accordance with law.

### H. *DNEL's Government–Mandated Write-off of Usinor Sacilor Debt in 1981*

An eighth challenge raised by Inland Steel against the *Final Determination* argues Commerce improperly determined the cancellation of Denain Nord–Est Longwy's ("DNEL") PACS in 1981 for FF 100 amounted to a grant of less than 0.5 percent of Usinor Sacilor's sales in 1981, and therefore Commerce erred by expensing the grant in 1981. Plaintiffs note "[t]he write-off of DNEL's PACS was treated in *France [Bismuth ]* as a nonrecurring grant and amortized over 15 years, with no reference to the size of the grant relative to Usinor's 1981 sales." (Pls.' Br. at 73 (footnote omitted).) Inland Steel argues "[a]lthough the grant itself involved an amount lower than 0.5 percent of Usinor's 1981 sales, it was provided as part of the broader 1981 bailout, the countervailable benefit from which was far in excess of 0.5 percent of Usinor's 1981 sales." (*Id.* at 73–74 (footnote omitted)), and therefore Commerce's determination is unsupported by record evidence and contrary to law.

In response, the government notes Commerce expensed in 1981 the benefit arising from DNEL's grant "[i]n accordance with section 355.49(a) of the Proposed Regulations, . . . with the result that there was no benefit to Usinor Sacilor in the POI." (Def.'s Br. at 95.) The government also asserts the inconsistent treatment of the DNEL grant in the *Final Determination* and the *France Bismuth* investigations resulted from the fact that "Commerce mistakenly failed to apply section 355.49(a) [in the *France Bismuth* investigation]." (*Id.* at 95.) The government asserts that had Commerce done so, "it would have, as in [the *Final Determination* ], expensed the benefit arising from the grant in 1981 and, therefore, found no countervailable benefit to Usinor Sacilor." (*Id.* at 95–96.)

 The Court is not persuaded by plaintiffs' argument. While the Court notes Commerce's treatment of DNEL's 1981 write-off of its PACS differs in the *France Bismuth* investigation and the *Final Determination,*

defendant explains this difference is due to an error committed by Commerce in the *France Bismuth* determination. The Court notes the *Proposed Regulations* provide Commerce will allocate nonrecurring countervailable benefits over two or more years if "[i]n the case of grants or equity infusions provided pursuant to a domestic program, [the benefit is] equal to or greater than 0.50 percent of all sales of the firm in question during the same year." *Proposed Regulations,* 54 Fed.Reg. at 23,384 (to be codified at 19 C.F.R. § 355.49(a)(3)(i)(A)). With respect to its consideration of DNEL's PACS write-off in the *Final Determination,* however, Commerce expensed DNEL's PACS write-off in 1981 because the amount of the grant did not exceed 0.50 percent of Usinor Sacilor's sales in 1981.

Although there is a discrepancy between these two investigations, the Court finds it is due to Commerce's improper application of the *Proposed Regulations* in the *France Bismuth* determination. The Court finds Commerce properly followed the *Proposed Regulations* in concluding DNEL's write-off of its PACS in 1981 did not confer a countervailable benefit upon Usinor Sacilor during the POI. Accordingly, the Court finds Commerce's determination Usinor Sacilor did not receive a countervailable benefit during the POI because the amount of the grant did not exceed 0.50 percent of Usinor Sacilor's sales in 1981 is supported by substantial evidence on the record and is otherwise in accordance with law.

### I. *Benefits Received by Usinor Sacilor From SODI's Regional Development Activities*

A ninth challenge raised by Inland Steel alleges Commerce erred in concluding Usinor Sacilor received no benefits from funds the GOF provided to Usinor Sacilor, which it in turn loaned to regional development entities known as *Societes de Developpement Industriel* ("SODIs"). Inland Steel challenges three aspects of Commerce's *Final Determination* with respect to this issue. First, Inland Steel asserts Commerce incorrectly "suggested—without using the word 'offset'—that the obligation Usinor–Sacilor

incurred when it received each SODI Advance somehow entitled the company to an offset or negated the subsidy." (Pls.' Br. at 76.) Plaintiffs assert in reaching this determination, Commerce failed to verify information to support its determination that "the entry of a liability on Usinor–Sacilor's balance sheet when SODI Advances were received reflected the company's obligation, after 1986, to make a loan to the SODIs to 'match' any GOF contribution received by the company and reloaned to the SODIs." (*Id.* at 76 (footnote omitted).) Additionally, plaintiffs assert Commerce failed to adequately explain what plaintiffs characterize as its conclusion "that the SODI Advances were in effect 'tied' to something other than steel production" and therefore were "likely to benefit only a subset of Usinor–Sacilor's French operations." (*Id.* at 77 (footnote omitted).)

Finally, plaintiffs assert "the Department either ignored or misconstrued evidence suggesting that the GOF through the SODI program assumed Usinor–Sacilor's legal obligations." (*Id.*) Plaintiffs assert the funds provided by the GOF to Usinor Sacilor between 1983 and 1986 were provided "to assist Usinor–Sacilor in meeting existing legal obligations 'to assist in the retraining of personnel who had lost their jobs.'" (*Id.* at 78 (emphasis omitted) (footnote omitted).) Inland Steel also asserts with respect to funds provided by the GOF to Usinor Sacilor after 1986, Commerce failed to verify information to support its finding that the funds did not relieve Usinor Sacilor of obligations to provide funds to the SODIs. Plaintiffs argue Commerce "simply *assumed* that the GOF's contributions ... no longer relieved Usinor–Sacilor of legal obligations." (*Id.* (footnote omitted).)

In response, the government notes Commerce's determination Usinor Sacilor received no benefit from the GOF's contributions was the basis for its decision not to countervail them, and not, as Inland Steel contends, because the contributions were tied to non-steel operations. Defendant also counters Inland Steel's assertion that the GOF's contributions between 1983 and 1986 helped Usinor Sacilor meet its existing legal

obligations, noting "the GOF did not make any SODIs contributions at all during the period from 1983 to 1986; the GOF only began advancing funds after 1986 when the GOF and Usinor Sacilor agreed upon an expanded role for the SODIs." (Def.'s Br. at 97 (citing *Final Determination,* 58 Fed.Reg. at 37,310).) Finally, the government asserts Commerce relied on record evidence, including Usinor Sacilor's questionnaire responses and the testimony of Usinor Sacilor officials at verification in concluding the GOF's post–1986 SODIs contributions did not relieve Usinor Sacilor of any legal obligations. While the government acknowledges Commerce's statement that "it had not found 'hard evidence' at verification", it goes on to note Commerce "did not concede that there was no evidence at all" and that "certain facts turned up at verification ... [that] were consistent with the testimony and seemed to indicate that the GOF's post–1986 contributions did not relieve Usinor Sacilor of any legal obligations." (*Id.* at 98.)

◼ The Court is unpersuaded by Inland Steel's arguments. With respect to plaintiffs' arguments that Commerce implicitly concluded the GOF's SODI contributions were characterized appropriately as an "offset" or as "tied" to non-steel operations, the Court finds plaintiffs mischaracterized the *Final Determination,* which clearly states Commerce found "*no benefit* to the company as a result of the GOF's contributions." *Final Determination,* 58 Fed.Reg. at 37,311 (emphasis added). The Court does not read the *Final Determination* to contain "veiled terminology" addressing offsets and tied subsidies as plaintiffs claim. Rather, the *Final Determination* contains several statements supporting Commerce's determination that the GOF's SODI contributions did not benefit Usinor Sacilor. First, Commerce verified that "the GOF monitored the funds provided for the SODIs to ensure that they were being used for the purposes established by the GOF." *Id.* at 37,310. Additionally, the *Final Determination* notes, "[w]hen the funds were repaid to the SODIs, the principal plus any interest paid was reloaned." *Id.* Accordingly, the Court finds Commerce's determination that the GOF's SODI contributions did not benefit Usinor Sacilor is supported by

substantial evidence on the record and is otherwise in accordance with law.

■ Additionally, the Court rejects plaintiffs' assertion Commerce "simply assumed that the GOF's contributions after 1986 no longer relieved Usinor–Sacilor of legal obligations." (Pls.' Br. at 78 (emphasis omitted) (footnote omitted).) The Court finds while the *Final Determination* states Commerce was unable to uncover "hard evidence" during verification to support its determination, Commerce's determination is supported by record evidence, including Usinor Sacilor's questionnaire responses and the testimony of various Usinor Sacilor officials at verification. Accordingly, the Court finds Commerce's determination the GOF's SODI contributions, which began in 1986, did not relieve Usinor Sacilor of any legal obligations to make funds available to the SODIs is supported by substantial evidence on the record and is otherwise in accordance with law.

### J. Commerce's Sales Denominator Calculations

Inland Steel's last challenge to the *Final Determination* asserts calculations made by Commerce with respect to Usinor Sacilor's sales denominator were not based on verified evidence and were methodologically flawed. Specifically, Inland Steel contends Commerce failed to verify the sales volume and value information submitted by Usinor Sacilor during verification. According to Inland Steel, the documents Usinor Sacilor provided at verification "focused (apparently at Usinor–Sacilor's request) almost exclusively on [the sale of] Sollac." (Pls.' Br. at 81.) Inland Steel asserts Commerce's examination of sales by Sollac, Europipe, Ugine and Lorfonte do not account for a significant or representative sample of Usinor Sacilor's total sales, and therefore "[i]t was unreasonable for the Department to consider the whole of Usinor–Sacilor's newly-reported sales data as having been verified." (*Id.* at 82.) Additionally, plaintiffs assert rather than "examin[ing] '*original* source documents, accounting records, financial statements, and any other pertinent documentation ...'", (*id.* at 82–83 (quoting *General Issues Appendix*, 58 Fed.Reg. at 37,235)),

Commerce verified the information submitted by checking it against a data-base maintained by Usinor Sacilor, which according to Inland Steel "does not provide assurance that the information is correct." (*Id.* at 83.) Finally, Inland Steel asserts that because Commerce could not obtain the information necessary to verify the information submitted by Usinor Sacilor, it should have relied on best information available ("BIA") in the *Final Determination.*

Additionally, Inland Steel asserts Commerce unreasonably relied on Usinor Sacilor's analysis accompanying the sales volume and value information it provided to Commerce, and therefore the *Final Determination* is not supported by substantial evidence on the record. Specifically, Inland Steel alleges Commerce adopted an inappropriate methodology "for isolating the sales value of French merchandise and reducing that value to an FOB (port) value." (*Id.* at 84 (footnote omitted).)

Finally, Inland Steel asserts Commerce failed to calculate the sales denominator by making an adjustment to the F.O.B. (port) value, despite what the plaintiffs characterize as Commerce's "apparent[ ] inten[t] to use as a sales denominator some estimate of FOB (port) value." (*Id.* at 88 (footnote omitted).)

In response, the government contends Commerce verified the accuracy of Usinor Sacilor's sales data as well as the accuracy of Usinor Sacilor's methodology for calculating total sales of its French-produced merchandise, and utilized an adjustment to the F.O.B.(port) value of Usinor Sacilor's French-produced sales in calculating the sales denominator.

■ The Court is not persuaded by plaintiffs' assertions. First, with respect to plaintiffs' argument Commerce improperly relied on the sales data contained in Exhibit C–3, which Usinor Sacilor submitted during verification, the Court notes Commerce not only compared the information submitted during verification to Usinor Sacilor's SIRUS database, but also consulted the audited sales figures for members of the consolidated Usinor Sacilor group. As noted above, Commerce typically relies on audited information

received during verification if it has been examined and confirmed by an independent accounting firm. *See supra* Parts I.A., I.F. The Court finds Commerce's actions were sufficient to verify the sales data's accuracy, and finds Commerce's utilization of the sales data contained in Exhibit C–3 is supported by substantial evidence on the record and is otherwise in accordance with law.

 As for plaintiffs' arguments Commerce improperly assumed all French company sales were of French-produced merchandise and relied on a flawed F.O.B.(port) methodology, the Court is again unpersuaded. The Court notes verification is not intended to constitute a comprehensive examination of all relevant sources. Rather, "[v]erification is a spot check and is not intended to be an exhaustive examination of the respondent's business." *Monsanto Co. v. United States*, 12 CIT 937, 944, 698 F.Supp. 275, 281 (1988). Precedent establishes this Court will give Commerce latitude in conducting verification. *See, e.g., Floral Trade Council v. United States*, 17 CIT 392, 399, 822 F.Supp. 766, 772 (1993); *PPG Industries, Inc. v. United States*, 15 CIT 615, 620, 781 F.Supp. 781, 787 (1991); *Kerr–McGee Chemical Corp. v. United States*, 14 CIT 344, 362, 739 F.Supp. 613, 628 (1990). The Court finds Commerce has satisfied these requirements in verifying the information contained in Exhibit C–3, and finds Commerce's reliance on the data contained in that exhibit is supported by substantial evidence in the record and is otherwise in accordance with law.

The Court also rejects Inland Steel's contention Commerce improperly relied on sales figures submitted by Usinor Sacilor in concluding "everything sold by a French company in the Usinor–Sacilor group was French merchandise" and on a flawed methodology submitted by Usinor Sacilor in calculating the F.O.B.(port) values for French-produced merchandise. (Pls.' Br. at 85.) With respect to Commerce's efforts to exclude non-French produced merchandise in calculating the sales value of Usinor Sacilor's French-produced merchandise, the Court notes only a small number of cross-border transactions were involved and that Commerce subtracted "an amount equal to the value of sales made

by Usinor Sacilor group companies outside France to Usinor Sacilor group companies within France" from Usinor Sacilor's sales figures. (Def.'s Br. at 124 (quoting *General Issues Appendix*, 58 Fed.Reg. at 37,235).) As for Commerce's supposed "adoption" of the methodologies submitted by Usinor Sacilor at verification to calculate an F.O.B.(port) value for the French-produced merchandise, the Court notes Commerce did not adopt the methodologies submitted at verification, but rather used them to evaluate the accuracy of two methodologies Usinor Sacilor provided in its questionnaire responses. Commerce found both sets of methodologies produced "similar results." *General Issues Appendix*, 58 Fed.Reg. 37,238. The Court finds Commerce's calculation of the value of Usinor Sacilor's French-produced sales and its utilization of the methodology to calculate an F.O.B.(port) adjustment provided in Usinor Sacilor's questionnaire responses is supported by substantial evidence in the record and is otherwise in accordance with law.

Finally, the Court rejects plaintiffs' argument Commerce failed to adjust the F.O.B.(port) value in calculating a sales denominator for Usinor Sacilor. The Court notes a section of the *General Issues Appendix* addressing the sales denominator calculations entitled "F.O.B. (Port) Value" addresses plaintiffs' concerns. In that section, Commerce notes "we have used the particular percentage provided in the responses to derive the amount of transportation charges to be deducted from the sales value of French-produced merchandise." *General Issues Appendix*, 58 Fed.Reg. at 37,238.

## PART II.

In addition to plaintiffs' challenges to the *Final Determination*, Usinor Sacilor, Sollac, and GTS ("defendant-intervenors" or "Usinor Sacilor") raise four challenges to Commerce's determination.

A. *Commerce's Determination the Reclassification of PACS and FIS Instruments Conferred Countervailable Benefits in Their Face Amount on Usinor Sacilor*

Usinor Sacilor challenges three findings made by Commerce supporting its conclusion

that the conversion of PACS and FIS instruments conferred countervailable benefits in their face amount on Usinor Sacilor.

### 1. *Equityworthiness of Usinor Sacilor in 1986 and 1988*

Defendant-Intervenors assert this Court should reverse Commerce's finding Usinor Sacilor was unequityworthy in 1986 and 1988 due to Commerce's failure to consider "compelling and uncontested record evidence concerning the Company's dramatic and successful restructuring", contrary to Commerce's practice of "generally 'analyz[ing] the future prospects of a company.'" Mem. in Supp. of Mot. for J. on the Agency R. on Behalf of Usinor Sacilor, Sollac and GTS ("Def.-Intervs.' Br.") at 11 (quoting *General Issues Appendix,* 58 Fed.Reg. at 37,244.) Specifically, defendant-intervenors fault Commerce's failure to analyze, in either the *Final Determination* or the *General Issues Appendix,* the McKinsey report, which evaluated the GOF's restructuring of the French steel industry in 1986 and predicted Usinor Sacilor's return to a solid financial position. Additionally, defendant-intervenors assert Commerce's unequityworthiness findings are further undermined by

> (i) its unreasonable rejection of [earnings before interest, taxes and depreciation (EBITD) ] as a measure of return on equity; and (ii) its refusal to distinguish between the investment perspectives of an 'inside' investor, such as the GOF, with an existing ownership stake in the Company, and an 'outside' investor with no preexisting ownership interest in the Company.

(Id. at 14 n. 33.)

Defendant responds Commerce not only considered, but also properly weighed, evidence of Usinor Sacilor's future prospects contained in the McKinsey report. Defendant asserts Commerce "discussed the study at length in a proprietary file memorandum and, in particular, the study's measurement of Usinor Sacilor's rate of return on equity

using earnings before interest, taxes and depreciation (or EBITD), rather than net income." (Def.'s Br. at 101.) In responding to Usinor Sacilor's assertion Commerce improperly rejected EBITD as a measurement of return on equity, defendant responds Commerce was "'not persuaded that EBITD is the best means of measuring the rate of return on equity.... The Department considers that the net income of a company, not EBITD, reflects the amount which would potentially accrue to the benefit of the shareholders.'" (*Id.* at 102 (quoting *Final Determination,* 58 Fed.Reg. at 37,305–06).) Additionally, defendant asserts even if the EBITD methodology were used in determining Usinor Sacilor's rate of return on equity, "[u]nder Usinor Sacilor's approach ... it is ... impossible to calculate a rate of return on equity for 1985 and 1986 because the equity denominator was negative." (*Id.* at 103 n. 42.)[23] Finally, defendant responds that with respect to distinctions between "inside" and "outside" investors, Commerce addressed the issue at length in the *General Issues Appendix,* concluding "'the perspectives of inside and outside investors cannot legitimately be distinguished.'" (*Id.* at 100 n. 39 (quoting *General Issues Appendix,* 58 Fed.Reg. at 37,249).)

■ The Court rejects defendant-intervenors' arguments. Initially, the Court notes Commerce's *Proposed Regulations* provide that in determining whether a firm is equityworthy, Commerce shall examine "whether a reasonable private investor could expect from the firm a reasonable rate of return within a reasonable period of time." *Proposed Regulations,* 54 Fed.Reg. at 23,371 (to be codified at 19 C.F.R. § 355.44(e)(2)). The *Proposed Regulations* also state Commerce may examine "current and past indicators of a firm's financial health", "future financial prospects" of the firm, "recent rate of return on equity", and "participation by private investors." *Id.* In the *General Issues Appendix,* Commerce states in applying these fac-

---

**23.** Commerce's observation is relevant because under the *Proposed Regulations,* Commerce may examine a firm's return on equity for the previous three years in determining whether it is equityworthy. In this case, to determine whether Usinor Sacilor was equityworthy in 1988,

Commerce would examine Usinor Sacilor's return on equity in 1985, 1986, and 1987. *See Proposed Regulations,* 54 Fed.Reg. at 23,371 (to be codified at 19 C.F.R. § 355.44(e)(2) (providing Commerce may examine "recent rate of return on equity" in evaluating equityworthiness)).

tors, "we tend to place greater reliance on past indicators as they are known with certainty and provide a clear track record of the company's performance, unlike studies of future expected performance which necessarily involve assumptions and speculation." *General Issues Appendix,* 58 Fed.Reg. at 37,244.

Despite its preference for relying on a firm's past financial indicators in evaluating equityworthiness, the Court notes Commerce did evaluate the McKinsey study and Usinor Sacilor's future prospects in a proprietary file memorandum. Commerce concluded a reasonable private investor would not have invested in Usinor Sacilor based on the projections in the McKinsey study and the financial difficulties of Usinor and Sacilor prior to the 1986 restructuring. *See* Final Equityworthiness Memorandum, Def.'s App. Tab 9 at 2–3.

Additionally, this Court previously has held Commerce's utilization of a methodology which does not consider EBITD as a measurement of a firm's rate of return on equity is in accordance with law. *See Usinor Sacilor v. United States,* 893 F.Supp. 1112, 1122–24 (CIT 1995). In that case, the Court upheld the methodology utilized by Commerce in the *France Bismuth* investigation, stating

Usinor has not suggested any basis for finding Commerce's chosen methodology unreasonable other than the fact that French investors frequently apply the EBITD methodology. Plaintiffs' position clearly does not address the substance of the "net income" methodology that Commerce adopted. Because the court finds that the "net income" methodology provides a reasonable measure of the companies' return on equity, the court concludes that its application in this investigation is proper.

*Usinor Sacilor,* 893 F.Supp. at 1124.

The Court notes even if Commerce had used EBITD to calculate Usinor Sacilor's rate of return on equity, it only would have been able to calculate that rate using EBITD in 1987. For the three years preceding 1986, Commerce would not have been able to cal-

culate a rate of return on equity using the EBITD methodology because Usinor Sacilor's equity denominator was negative in each of those three years. Similarly, in evaluating Usinor Sacilor's equityworthiness in 1988, Commerce would not have been able to calculate an EBITD measurement in 1985 and 1986 because the denominator would have been negative, and the rate of return on equity in 1987 would have been negative. (*See* Def.'s Br. at 102–03 n. 42.)

Based on these observations, the Court finds Commerce correctly concluded the projections made in the McKinsey study would not have persuaded a reasonable private investor to invest in Usinor Sacilor. Additionally, the Court finds Commerce's rejection of EBITD as a measurement of Usinor Sacilor's return on equity and its refusal to distinguish between "outside" and "inside" investors is supported by substantial evidence on the record and is otherwise in accordance with law. The *Proposed Regulations* clearly state Commerce will make a determination with respect to "a private investor" and the Court finds Commerce complied with the *Proposed Regulations* in conducting its analysis. *See Proposed Regulations,* 54 Fed.Reg. at 23,371 (to be codified at 19 C.F.R. § 355.44(e)(2)) (stating Commerce's "principal criterion [in evaluating a firm's equityworthiness] is whether *a reasonable private investor* could expect from the firm a reasonable rate of return within a reasonable period of time") (emphasis added). Accordingly, the Court finds Commerce's determination that Usinor Sacilor was not equityworthy in 1986 or 1988 is supported by substantial evidence on the record and is otherwise in accordance with law.

### 2. Commerce's Determination the PACS and FIS Instruments Were Debt Upon Issuance

Additionally, defendant-intervenors argue Commerce erred in concluding the reclassification of the PACS [24] and FIS instruments [25]

---

24. PACS are loans with special characteristics, the principal terms of which required the debtor company to: (1) make interest payments of 0.1

percent for the first five years following the loan; (2) make interest payments of 1.0 percent and make principal and supplementary interest pay-

conferred countervailable benefits on Usinor Sacilor because, defendant-intervenors assert, these instruments were equity upon issuance. In advancing this argument, Usinor Sacilor asserts Commerce failed to consider "conclusive record evidence demonstrating that the PACS and FIS instruments were equity upon issuance" and Commerce improperly found the PACS and FIS instruments "carried with them an 'obligation for repayment' and guaranteed interest payments." (Def.-Intervs.' Br. at 15 (quoting *General Issues Appendix,* 58 Fed.Reg. at 37,255).) According to defendant-intervenors, any countervailable benefit conferred on Usinor Sacilor "occurred upon issuance of the instruments, not upon their reclassifications, which were little more than bookkeeping transactions." (*Id.* at 16.)

With respect to the PACS, Usinor Sacilor contends they "lacked the features long recognized by the courts as essential characteristics of genuine debt: they lacked a real, compensatory interest rate, they carried no repayment schedule, and the only provision for repayment was out of profits." (*Id.* at 17–18 (footnote omitted).) According to Usinor Sacilor, "[a] contingent obligation to repay, ... characterizes equity, not debt." (*Id.* at 18.)

Usinor Sacilor also raises similar arguments with respect to the reclassification of the FIS instruments. Defendant–Intervenors argue "the record establishes that the FIS instruments, like the PACS, effectively represented a permanent commitment of funds by the GOF to Usinor Sacilor." (*Id.* at 20.) Usinor Sacilor also asserts "[a]lthough the FIS agreements did contain nominal repayment schedules", "[t]he only funds changing hands were within the Government of France." (*Id.*) Finally, Usinor Sacilor asserts it "never made any payments under the repayment schedules." (*Id.*)

With respect to Usinor Sacilor's assertions regarding PACS, Commerce's response asserts "[c]learly, it was contemplated that Usinor and Sacilor would repay the face amount of the PACS plus interest." (Def.'s Br. at 47.) Additionally, Commerce asserts the repayments were to be made pursuant to a schedule "set by the PACS holder after an initial period in which the PACS holder could evaluate the debtor company's financial condition." (*Id.* at 47–48.) With respect to Usinor Sacilor's argument the PACS should be considered to be equity because the repayments were to be made from Usinor Sacilor's profits, defendant notes that even if Usinor Sacilor was unable to make certain scheduled payments, "the debtor company remains obligated, and only the length of its payment schedule is affected. Indeed, the debtor company's repayment obligation only disappeared when the PACS were converted to common stock." (*Id.* at 49.)

With respect to Commerce's finding the conversion of FIS bonds into common stock conferred a countervailable benefit upon Usinor Sacilor, defendant's brief asserts that at the time of their issuance "the FIS bonds carried a repayment obligation." (*Id.* at 62.) According to the defendant

[t]he nature of the FIS bonds was not altered by the fact that the GOF made the initial one or two principal repayments, nor by the fact that the GOF guaranteed Usinor Sacilor's subsequent principal repayments. The FIS bonds remained debt instruments, as they indisputably obligated Usinor Sacilor to pay off the bond principal.

(*Id.* at 63.) Finally, the government concludes "[t]he GOF's payments only altered the amount of the benefit conferred on Usinor Sacilor by the preferential terms of the FIS bonds while they were outstanding debt instruments, *i.e.,* prior to being converted to common stock." (*Id.* at 64.)

---

ments, with the amount to be set by the Minister of Economy, beginning in the sixth year after receipt of the loan; (3) make the principal and supplementary interest payments from its profits; (4) pay the face amount of the PACS plus interest; and (5) subordinate the PACS to all other form of debt, although PACS were superior to common stock.

**25.** In 1983, the GOF created the Steel Intervention Fund ("FIS") to facilitate Usinor and Sacilor's exercise of their authority to issue convertible bonds. Usinor and Sacilor issued convertible bonds to the FIS, which in turn issued bonds, guaranteed by the GOF, to the public.

■ The Court rejects Usinor Sacilor's assertions concerning Commerce's treatment of the PACS. The Court observes as of the time of their issuance, the PACS contained repayment obligations. For the first five years after their issuance, the PACS contracts provide the debtor is obligated to make interest payments at a rate of 0.1 percent. *See* Company Verification Report, Def.App. Tab 1, Ex. C–32 (art. 2); GOF Response, Def.App. Tab 2, Exs. 28–A (art. 3), 28–B (art. 2). Additionally, the Court notes the PACS contracts provide that after the passage of five years from the date of issuance, the debtor is obligated to repay the loan principal "according to a schedule" established by the Minister of Economy, who is to "define . . . the amounts available for the loans with special characteristics, the allotment between supplementary remuneration and repayments." *See* Company Verification Report, Def.App. Tab 1, Ex. C–32 (arts. 2, 5); GOF Response, Def.App. Tab 2, Ex. 28–B (arts. 2,5). The Court also notes the translations of the PACS contracts, which are part of the administrative record, contain terms such as "debt" and "repayment" which strongly suggest a debt, rather than an equity-type, arrangement. *See* Company Verification Report, Def.App. Tab 1, Ex. C–32 (article 2 provides "[t]he *debt* shall bear interest at a rate of 0.1%" and "the *debt* shall be amortized according to a schedule and with a *repayment* rate that is identical to these of the loan with special characteristics authorized in article 1") (emphasis added); GOF Response, Def.App. Tab 2, Ex. 28–B (article 5 provides "[t]he Minister of Economy shall define . . . the allotment between supplementary *remuneration* and *repayments*").

The Court finds the conditions established by the PACS contracts concerning repayment, as well as the language included in those contracts, support Commerce's determination the PACS constituted debt upon issuance. The fact that the PACS contained provisions making repayment contingent on Usinor Sacilor earning a profit does not alter the Court's conclusion. While Usinor Sacilor's repayment obligation was contingent on earning a profit, the company nevertheless was subject to liabilities on the PACS con-

tracts during the period the contracts were outstanding prior to their conversion into common stock. Accordingly, the Court finds Commerce's determination the PACS contracts were debt upon issuance is supported by substantial evidence on the record and is otherwise in accord with law.

■ With respect to the FIS bonds, the Court notes the parties agree these instruments contain a fixed payment schedule. The Court is not persuaded, however, by Usinor Sacilor's argument the FIS bonds should be classified as equity instruments. While Usinor Sacilor argues the GOF made the first few principal payments and guaranteed remaining principal payments in the event Usinor Sacilor's financial position did not improve, the fact remains Usinor Sacilor was at all times obligated to make interest payments on the bonds, and it was additionally responsible for repaying the bonds' principal. *See* Def.App. Tab 4, Ex. GOF–2 (article 6 of the FIS contract provides that after Jan. 1, 1987, Usinor and Sacilor will meet the repayment obligations due under the FIS bonds, assuming a recovery of their financial position). Accordingly, the Court rejects Usinor Sacilor's arguments and finds Commerce's determination the FIS bonds constituted debt upon their issuance is supported by substantial evidence on the record and is otherwise in accordance with law.

3. *Commerce's Valuation of the Benefits Conferred Upon Usinor Sacilor from the Conversion of the PACS and FIS Instruments*

Finally, defendant-intervenors argue in the alternative that even if Usinor Sacilor was unequityworthy in 1986 and 1988 and the PACS and FIS instruments were debt upon issuance, Commerce improperly measured the benefit to Usinor Sacilor from the conversion, and the conversion conferred no measurable benefit on Usinor Sacilor. First, defendant-intervenors assert Commerce overvalued the benefits received by Usinor Sacilor because "most, if not all, of the benefits from these infusions had been consumed by the time of the reclassifications." (Def.-Intervs.' Br. at 21.) Usinor Sacilor contends that rather than countervailing the face

amount of the PACS and FIS instruments, "the cognizable and measurable benefit is the then *present value* of the forgiven obligations, *not* the face amount of the reclassified instruments." (*Id.* at 22 (footnote omitted).) Second, defendant-intervenors argue Commerce's finding Usinor Sacilor uncreditworthy in 1986 and 1988 *"should have required* the [International Trade Administration] to find that there was *no significant measurable benefit* to the Company from the 'forgiveness' of the PACS obligations because the right to share in future distributable earnings was virtually *worthless."* (*Id.* at 25.) Additionally, Usinor Sacilor asserts Commerce's failure to calculate the present value of the benefits conferred by the PACS "is particularly egregious in light of record evidence that PACS issued by Usinor Sacilor to its former majority shareholder 'were essentially written off in 1981 at a redemption value of FF 100.'" (*Id.* at 25–26 (quoting *Final Determination,* 58 Fed.Reg. at 37,308) (emphasis in Def.-Intervs.' Br. omitted).)

Usinor Sacilor raises similar arguments with respect to Commerce's valuation of the benefits conferred by the reclassification of the FIS instruments. Defendant–Intervenors assert "[t]he record establishes that the fundamental effect of these reclassifications was to eliminate a 'contingent' repayment obligation tied to the Company's profitability and the nominal interest obligation." (*Id.* at 26.) Usinor Sacilor argues

> [s]ince the [International Trade Administration] found the Company to be unequityworthy in 1986 and 1988, the years in which the FIS instruments were converted, it should have also determined that the value of this obligation was virtually nothing—*not* the full face value of the instruments.

(*Id.* at 27.)

Commerce responds with two arguments. First, with respect to Usinor Sacilor's argument the benefit should be measured in terms of its present value, the government emphasizes Commerce's methodology calls for it "to measure the countervailable benefit of preferential loans before and after their forgiveness, *i.e.,* [by applying] Commerce's loan methodology and Commerce's grant

methodology." (Def.'s Br. at 51.) Therefore, defendant asserts, the only reasonable measurement of the benefit conferred at the time of loan forgiveness "is the total outstanding principal of the loan, which, in this case, is the original face value of the PACS (because Usinor Sacilor had made no principal payments)." (*Id.* at 51.) Defendant's brief notes that prior to the forgiveness, "Commerce had treated Usinor Sacilor as having an obligation to repay the outstanding principal in full, and Commerce consequently did not attempt to countervail any part of it." (*Id.* at 52–53.)

Additionally, defendant responds to Usinor Sacilor's argument the value of the benefit received when the instruments were converted was "essentially zero" because Commerce found Usinor Sacilor to be unequityworthy in 1986 and 1988. The government's brief raises three arguments in response. First, defendant notes

> a finding of unequityworthiness does not mean that a firm is not profitable, nor does it mean that the firm will continue to be unprofitable in the future. It simply means that, from the perspective of a reasonable private investor at the time of an investigated investment, the firm was unable to generate a reasonable rate of return—not no return at all—within a reasonable period of time.

(*Id.* at 57.) Second, defendant notes "under the PACS contract, Usinor Sacilor's repayment obligation does not disappear if, in a given year, . . . it did not realize profits." (*Id.* at 57–58.) Finally, defendant challenges Usinor Sacilor's suggestion the PACS were worth only FF 100 in 1981 when Usinor repaid PACS issued to its former majority shareholder. Commerce notes it "found in the final determination that Usinor's former majority shareholder accepted the FF 100 payment only at the direction of the GOF" and that "in 1989, Usinor Sacilor repaid the entire face value of PACS held by the former majority shareholder of Sacilor, totalling (sic) FF 62.5 million." (*Id.* at 58, 58–59 (footnote omitted).)

■ The Court rejects Usinor Sacilor's contention that Commerce's failure to consider the present value of the PACS and FIS

instruments, rather than the face value of the outstanding principal, renders Commerce's analysis improper. As discussed above, both the PACS and FIS bonds were debt upon their issuance. The conversion of those instruments to common stock eliminated Usinor Sacilor's obligation to repay the remaining principal on those debts, and therefore conferred a countervailable benefit upon Usinor Sacilor in the amount of the face value of the outstanding debt. This Court previously noted "the extent to which the companies' unprofitability might have delayed repayment on the instruments is irrelevant to an analysis of whether and to what extent the instruments' conversions conferred countervailable benefits on the companies." *Usinor Sacilor*, 893 F.Supp. at 1125. Accordingly, the Court finds Commerce's determination the conversion of PACS and FIS bonds conferred countervailable benefits upon Usinor Sacilor in the amount of the face value of the remaining principal is supported by substantial evidence on the record and is otherwise in accordance with law.

B. *Commerce's Determination the Shareholders' Advances Were Nonrecurring Grants*

In the *Final Determination*, Commerce considered three criteria in differentiating recurring and nonrecurring benefits. According to Commerce's methodology, a benefit is nonrecurring if: (1) the benefits are exceptional; (2) the recipient cannot expect to receive benefits on an ongoing basis from review period to review period; and (3) the provision of funds by the government must be approved every year. *See General Issues Appendix*, 58 Fed.Reg. at 37,226. In applying this analytical framework to the shareholders' advances received by Usinor Sacilor, Commerce determined the shareholders' advances "constituted nonrecurring benefits because each advance was contingent upon specific government approval" and amortized the benefits they conferred upon Usinor Sacilor over 15 years. *Id.* at 37,228.

Defendant-Intervenors contend Commerce's determination the shareholders' advances were nonrecurring grants is unsupported by substantial record evidence and is

contrary to law. Usinor Sacilor contends "[t]he record demonstrates that shareholder advances were provided to the Company on a regular basis" and therefore, the advances should have been treated as recurring grants and expensed in the years Usinor Sacilor received them. (Def.-Intervs.' Br. at 29.) Defendant–Intervenors argue the fact that the GOF held 74% of Usinor Sacilor's stock as of 1981 reflects "there was never any question that funds to enable the Company to continue in operation would be provided." (*Id.* at 30 n. 70.) Additionally, Usinor Sacilor contends "[t]he record clearly shows that only the precise amount of the grants—not whether the grants would be made—was subject to a monthly pro forma review with the GOF's Ministry of the Treasury based upon the Company's forecast of daily cash needs." (*Id.* at 31.)

Defendant responds that based on the record evidence before it, Commerce concluded the shareholders' advances "were exceptional and, therefore, non-recurring." (Def.'s Br. at 66.) Defendant notes while "these advances were provided on a somewhat regular basis from 1982 to 1986, each advance required specific approval by the GOF." (*Id.* at 66–67.)

The Court notes Commerce's *Proposed Regulations* initially established the elements Commerce considered in determining whether a grant is recurring. Those factors were: (1) whether the program providing benefits is exceptional; (2) whether the program is longstanding; and (3) whether there is reason to believe the program will not be continued in the future. *See Proposed Regulations*, 54 Fed.Reg. at 23,376 (to be codified at 19 C.F.R. § 355.49(a)(2)). In the *General Issues Appendix*, however, Commerce notes it adopted a revised test in the *France Bismuth* investigation. The factors weighed by Commerce were: (1) the benefits were exceptional; (2) the recipient could not expect to receive the benefits on an ongoing basis; and or (3) the provision of funds from the government had to be approved every year. *General Issues Appendix*, 58 Fed.Reg. at 37,226. The *General Issues Appendix* continues on to state "[i]f any of the questions in the modified test are answered affirmatively, the benefit provided will generally

be considered nonrecurring and we will allocate the benefit over time." *Id.* at 37,226.

■ In the investigation presently under review, Commerce determined Usinor and Sacilor received advances from the GOF between 1982 and 1986, that the advances carried no interest payments, that the GOF did not place any preconditions on their receipt, and that "the advances constitute countervailable grants, as no shares were received for them." *Final Determination,* 58 Fed. Reg. at 37,307. The Court notes the administrative record establishes a Bureau Chief in the French Ministry of Treasury was responsible for authorizing the advances, and therefore some form of government approval, whether "formal" or "informal", was required before the shareholders' advances were issued. The Court notes Commerce's methodology does not require a particular form of government approval, but rather only states it will consider whether "the provision of funds by the government must be approved every year." *General Issues Appendix,* 58 Fed.Reg. at 37,226. Additionally, the *ad hoc* nature of the grant is reflected by the fact that the amount of the shareholders' advances was not constant, but rather depended on the magnitude of the losses incurred by Usinor and Sacilor. Accordingly, the Court finds Commerce's determination the shareholders' advances received by Usinor and Sacilor constitute countervailable grants is supported by substantial evidence on the record and is otherwise in accordance with law

C. *Commerce's Inclusion of a Risk–Premium in Calculating the Discount Rate During Usinor Sacilor's Uncreditworthy Years*

In allocating benefits received during the POI from a nonrecurring countervailable grant, Commerce (1) determines the amount of the countervailable benefit; (2) assigns a discount rate; and (3) constructs a benefit stream. *See Proposed Regulations,* 54 Fed. Reg. at 23,384 (to be codified at 19 C.F.R. § 355.49(b)(1)). In assigning a discount rate, Commerce's *Proposed Regulations* specify, in order of priority, the use of "(i) [t]he cost of long-term, fixed-rate debt of the firm in

question . . .; (2)[t]he average cost of long-term, fixed-rate debt in the country in question; or (iii)[a] rate which the Secretary considers to be most appropriate." *Proposed Regulations,* 54 Fed.Reg. at 23,384 (to be codified at 19 C.F.R. § 355.49(b)(1)). Commerce's objective in applying this methodology is to

> create a stream of benefits in such a way that the company in question would be indifferent between: (1) Receiving the benefit in a lump sum, and (2) receiving a series of payments over the allocation period. The use of a company-specific discount rate is what guarantees that we will achieve indifference.

*Final Determination,* 58 Fed.Reg. at 37,314. In the *Final Determination,* Commerce used Usinor Sacilor's benchmark interest rate as the discount rate in calculating the benefits certain grants conferred upon Usinor Sacilor. Commerce used this rate because a company-specific rate for Usinor Sacilor was not available. *See* Memorandum from Team to Barbara R. Stafford re: Final Determinations of Countervailing Duty Investigation of Certain Steel Products from France, Def.-Interv.App. Tab 15 at 26 ("Usinor Sacilor did not report its actual cost for long-term, fixed or variable rate debt. Therefore, our regulations instruct us to use the national average long-term fixed rate interest rate in France."). Additionally, the *Proposed Regulations* provide the benchmark interest rate for uncreditworthy companies shall include a risk premium equal to 12 percent of the prime rate. *See Proposed Regulations,* 54 Fed.Reg. 23,381 (to be codified at 19 C.F.R. § 355.44(b)(6)(iv) ("[I]n the Secretary deems a firm to be uncreditworthy . . ., the Secretary will calculate the benchmark interest rate for a long-term government loan by taking the sum of 12 percent of the prime interest rate in the country in question and: [other relevant factors] . . . .")).

Defendant-Intervenors contend Commerce improperly departed from its *Proposed Regulations* by using the benchmark interest rate calculated for Usinor Sacilor, which defendant-intervenors note is the "highest long-term fixed interest rate commonly available to firms in the country in question", (Def.-

Intervs.' Br. at 33 (quoting *Proposed Regulations*, 54 Fed.Reg. at 23,381 (to be codified at 19 C.F.R. § 355.44(b)(6)(iv)(A)(1)))), as Usinor Sacilor's discount rate. Usinor Sacilor notes "[t]he [International Trade Administration] concedes that its Proposed Regulations, which purport to codify its existing practice with respect to the identification and measurement of subsidies under the CVD law, 'do not provide for uncreditworthy discount rates,' including the addition of a risk premium." (*Id.* at 33–34 (footnote omitted).) Additionally, defendant-intervenors maintain Commerce improperly departed from its *Proposed Regulations* by adding a risk premium to the discount rate in the years Usinor Sacilor was determined to be uncreditworthy. Usinor Sacilor asserts Commerce has failed to articulate a rationale explaining why it equated "an 'uncreditworthy' interest rate used as a benchmark to determine the countervailability of loans ... with a company-specific discount rate intended to reflect the firm's actual cost of long-term debt." (*Id.* at 34 (emphasis omitted).)

Defendant responds "Commerce's practice is not to follow the Proposed Regulations when setting the discount rate for an uncreditworthy company", and "Commerce uses the same rate for both the benchmark interest rate and the discount rate in order to avoid understating the benefit stream being measured." (Def.'s Br. at 116.) Defendant contends since the issuance of the *Proposed Regulations* in 1989, Commerce consistently has used the benchmark rate as the discount rate for uncreditworthy companies. Similarly, plaintiffs maintain Commerce's practice was adopted in the 1984 Subsidies Appendix, *see Cold–Rolled Carbon Steel Flat–Rolled Products From Argentina: Final Affirmative Countervailing Duty Determination and Countervailing Duty Order*, 49 Fed.Reg. 18,-006, 18,020–21 (Dep't Comm.1984) (final determ.) (*"Subsidies Appendix"*), and that Commerce consistently has utilized this methodology since its adoption.

■ The Court rejects defendant-intervenors challenge. In reaching this conclusion, the Court notes although the utilization of an uncreditworthy discount rate is not addressed in the *Proposed Regulations,* Commerce consistently has followed its practice of using uncreditworthy discount rates both before and after issuance of the *Proposed Regulations. See, e.g., Final Affirmative Countervailing Duty Determination: Certain Hot Rolled Lead and Bismuth Carbon Steel Products From France,* 58 Fed.Reg. 6,221, 6,224 (Dep't Comm.1993) (final determ.) (benchmark interest rate used as discount rate); *Final Affirmative Countervailing Duty Determinations: Certain Steel Products From Spain,* 58 Fed.Reg. 37,374,-37,384–85 (Dep't Comm 1993) (final determ.) (same); *Final Affirmative Countervailing Duty Determination: New Steel Rail, Except Light Rail, From Canada,* 54 Fed.Reg. 31,991, 31,994 (Dep't Comm.1989) (final determ.) (same); *Certain Carbon Steel Products From Brazil; Final Results of Countervailing Duty Administrative Review,* 52 Fed.Reg. 829, 831 (Dep't Comm.1987) (final results of admin. review) (same).

■ Additionally, the Court finds Commerce's utilization of a company's benchmark interest rate as a discount rate in countervailing the benefits of grants conferred on that company is a reasonable means of allocating the benefits of grants in a manner that corresponds to commercial reality. The Court finds Commerce's practice is reasonable as a means of treating both grants and loans similarly in order to avoid creating incentives for foreign governments to provide assistance to companies in one form over another. *See Usinor Sacilor,* 893 F.Supp. at 1134 (citing S.Rep. No. 249, 96th Cong., 1st Sess. 85–86 (1979)), *reprinted in* 1979 U.S.C.C.A.N. 381, 471–72 (stressing the importance of developing reasonable methods of subsidy allocation in order to account for the commercial and competitive benefit provided to the recipient).

Based on the fact Commerce consistently has followed its methodology for allocating the benefits provided to uncreditworthy firms from government grants and equity infusions, and the fact that Commerce's methodology is reasonable in treating countervailable loans and grants similarly, this Court finds Commerce's use of Usinor Sacilor's benchmark interest rate as the discount rate in allocating the benefits provided to

Usinor Sacilor during a period when it was uncreditworthy is supported by substantial evidence on the record and is otherwise in accordance with law.

D. *Commerce's Determinations on the Countervailability of Various Loan Programs*

Finally, Usinor Sacilor challenges Commerce's finding various programs under which Usinor Sacilor received loans are countervailable. The challenges raised by Usinor Sacilor apply to the following programs.

### 1. *CFDI Loans*

Commerce concluded the CFDI loans [26] received by Usinor Sacilor were countervailable based on its determination the loans were "*de facto* limited to a specific enterprise or industry or group of enterprises or industries" due to its inability to obtain "sufficient verified information on the record regarding the distribution of CFDI loans." *Final Determination*, 58 Fed.Reg. at 37,309.

Usinor Sacilor asserts Commerce's conclusion is inappropriate given that "[r]espondents cooperated with the [International Trade Administration] to the maximum extent possible and provided information supplied by the CFDI which clearly demonstrated that the loans were not *de facto* specific to the steel industry." (Def.-Intervs.' Br. at 36.) Defendant–Intervenors also assert Commerce's determination is "*directly contrary to the evidence of record*" which reflects "the basic industries of energy, chemical, coal and steel, metallurgy and paper ... received only 13.28% of the CFDI loans distributed during the period 1983–1988" while these industries were responsible for roughly a third of industrial production in France between 1987 and 1990. (*Id.*) Finally, Usinor Sacilor argues it should not be penalized by Commerce's adverse inference because "GOF officials could not provide documentation of the thousands of loans on which the statistics presented to the [International Trade Administration] were based." (*Id.* at 36–37.)

Commerce responds that following its determination the consolidation of Usinor Sacilor's outstanding CFDI loans in 1991 created new loans with new terms and conditions, it examined the distribution of all CFDI loans issued in 1991. Based on record evidence Usinor Sacilor received "new" CFDI loans as a result of the 1991 consolidation and the failure of the GOF to produce verifiable evidence that the loans were non-specific, Commerce determined the CFDI loans were specific to Usinor Sacilor. In response to Usinor Sacilor's argument that a letter from the president of CFDI provides record evidence the CFDI loans were not specific, Commerce notes "the GOF wholly failed verification of the CFDI president's letter. The GOF did not produce a single document to substantiate the statistics in that letter, nor did it produce any of the source documents or worksheets used to derive those statistics." (Def.'s Br. at 71.) Commerce asserts under these circumstances, "[it] was entirely justified in using BIA." (*Id.* at 71 (citing 19 U.S.C. § 1677e(b)) ("If the administering authority is unable to verify the accuracy of the information submitted, it shall use the best information available to it as the basis for its action. . . .").)

Initially, the Court notes Commerce officials provided the GOF with several opportunities to provide documentation during verification to support the statistics contained in the letter signed by the president of CFDI. The Verification Report notes Commerce officials conducting the verification "asked for supporting documentation for" the letters statistics, and "asked if [the] distribution percentages [in the letter] were published." GOF Verification Report, reprinted in Def.App. Tab 4 at 13. In responding to these requests, the CFDI officials replied they were unable to provide documentation supporting the statistics and that there was no published source containing the statistics. Because the CFDI officials did not respond to these requests, the Court finds Commerce was justified in resorting to use of BIA. Accordingly, the Court finds

**26.** CFDI loans are participative loans available to all French companies provided at below market interest rates with repayment based on a share of future profits according to an agreed upon formula.

Commerce's adverse inference that the CFDI loans were "de facto limited to a specific enterprise or industry or group of enterprises or industries", *Final Determination*, 58 Fed.Reg. at 37,309, is supported by substantial evidence on the record and is otherwise in accordance with law.

### 2. *ECSC Article 54 Investment Loans*

Usinor Sacilor challenges Commerce's decision to countervail certain Article 54 industrial development loans provided to Usinor Sacilor by the European Coal and Steel Community ("ECSC"). Usinor Sacilor asserts "[b]ecause any purported benefit associated with the Article 54 loans was conferred by the ECSC, an entity that is funded entirely by ECSC companies such as Usinor Sacilor, the [International Trade Administration]'s determination that these loans are countervailable cannot stand." (Def.-Intervs.' Br. at 37.) Additionally, defendant-intervenors argue "[i]n exchange for its contribution to the ECSC, a member company receives a variety of benefits" including "the availability of Article 54 loans." (*Id.* at 38.) Usinor Sacilor contends because "any benefits conferred by the ECSC are made possible by the contributions of its member companies, and as such, cannot be treated as countervailable." (*Id.* at 39.)

Commerce responds while it "does recognize that no benefit is conferred on the recipient company when the grant is sourced directly from the ECSC operating budget, given that this budget is funded by levies on ECSC member companies", the case at hand involves the ECSC "lending money that it obtains from the financial markets." (Def.'s Br. at 94.) Defendant's brief continues on to contend "the ECSC conferred a real benefit on Usinor Sacilor when it made loans to it" because "the money loaned by the ECSC is not money that the recipient company—at least in the case of Usinor Sacilor—could have obtained on its own." (*Id.*) Finally, defendant notes "[i]n both creditworthy and uncreditworthy years, Commerce found that the interest rates on the countervailed ECSC loans were below the market rate of interest that would have been available to Usinor Sacilor." (*Id.* at 94–95.)

■ The Court notes Usinor Sacilor acknowledges the funds made available through Article 54 loans were not provided through membership dues, but rather were "provided by the ECSC from funds it obtained in the financial markets." (Def.-Intervs.' Br. at 38 (citation omitted).) Additionally, the Court notes Commerce did not countervail ECSC Redeployment Aid payments made from the ECSC operational budget. *See Final Determination*, 58 Fed.Reg. at 37,309. Therefore, while Usinor Sacilor contends the ECSC Article 54 loans should not be countervailed because "any benefits conferred by the ECSC are made possible by the contributions of its member companies, and as such, cannot be treated as countervailable", (Def.-Intervs.' Br. at 39), the Court notes Commerce established at verification that "Article 54 loans are not funded through the ECSC budget", but rather the Article 54 loans "are direct loans from the EC Commission carrying a slightly higher rate than that at which the Commission obtained them." *Final Determination*, 58 Fed.Reg. at 37,308.

The Court notes the ECSC Article 54 loans were not made available from funds comprising the operating budget, but rather were made available by obtaining funds through the financial markets, and thus the ECSC made funds available to Usinor Sacilor which it otherwise would not have been able to obtain. Additionally, these loans were made available to Usinor Sacilor at interest rates below the market rates, and therefore conferred a benefit on Usinor Sacilor. Accordingly, the Court finds Commerce's determination that certain ECSC Article 54 industrial development loans are countervailable is supported by substantial evidence on the record and is otherwise in accordance with law.

### 3. *Unreported Participative Loans*

Finally, Usinor Sacilor challenges Commerce's determination to countervail certain additional participative loans discovered by Commerce during verification. Defendant-Intervenors contend that "[d]espite ... record evidence that these were not zero rate loans, the [International Trade Administration] used information available and treated the outstanding principal as a zero rate short-term loan." (Def.-Intervs.' Br. at 39

(emphasis omitted).) Usinor Sacilor asserts "[t]he [International Trade Administration] was unjustified in completely disregarding this record evidence that these loans carried an interest obligation solely because it was not provided with additional information about the programs under which these loans were issued." (*Id.* (footnote omitted).)

Commerce responds because these participative loans were discovered for the first time at verification "it had no choice but to use BIA and countervail these loans." (Def.'s Br. at 79.) Defendant's brief also asserts that because "the type of data that Commerce needs to make accurate calculations" was missing from the record, "Commerce must make an adverse inference regarding the missing data." (*Id.* at 80.) Finally, with respect to its selection of an interest rate by BIA, Commerce states it "should not select a BIA that somehow attempts to approximate the missing data, as Usinor Sacilor seems to be suggesting", and asserts "[i]n selecting the particular BIA interest rate in this case, ... Commerce followed its normal practice." (*Id.* at 80, 81.)

■■■■■ The regulations require the use of BIA whenever the Secretary "(1) Does not receive a complete, accurate, and timely response to the Secretary's request for factual information; or (2) Is unable to verify, within the time specified, the accuracy and completeness of the factual information submitted." 19 C.F.R. § 353.37(a) (1993). The statute provides Commerce "shall, whenever a party or any other person refuses or is unable to produce information requested in a timely manner and in the form required, or otherwise significantly impedes an investigation, use the best information otherwise available." 19 U.S.C. § 1677e(c) (1988). Regarding Commerce's selection of BIA, in *Allied–Signal Aerospace Co. v. United States*, 996 F.2d 1185, 1191 (Fed.Cir.1993), the Federal Circuit notes "because Congress has 'explicitly left a gap for the agency to fill' in determining what constitutes the best information available, the [International Trade Administration]'s construction of the statute must be accorded considerable deference." (quoting *Chevron U.S.A., Inc. v. Natural Re-*

*sources Defense Council, Inc.*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984)).

■■■■■ Because the statute contains a gap, it is within Commerce's discretion to decide what constitutes best information available in a particular case and this Court must review that decision deferentially. *Allied–Signal Aerospace*, 996 F.2d at 1191–92. It is therefore within Commerce's discretion to choose BIA adverse to non-cooperating parties. *See Saha Thai Steel Pipe Co. v. United States*, 17 CIT 727, 732–35, 828 F.Supp. 57, 62–64 (1993). Commerce explained its choice of BIA, noting that after discovering the previously unreported loans during verification

[Usinor Sacilor] officials could give no further explanation of this category [of loans].

Because these loans were unreported and we have no information about the programs under which these loans might have been issued, we are applying best information available.

*Final Determination*, 58 Fed.Reg. at 37,310. This Court finds Commerce exercised its discretion in this matter reasonably and its application and choice of BIA in estimating the net subsidy provided to Usinor Sacilor by the unreported participative loans discovered during verification is supported by substantial evidence on the record and is otherwise in accordance with law.

### CONCLUSION

This Court sustains the *Final Determination* in its entirety finding it is supported by substantial evidence on the record and otherwise in accordance with law, with the exception that the Court will remand to Commerce the sole issue of whether certain Crédit National export loans discovered at verification conferred a countervailable benefit upon Usinor Sacilor.

### ORDER

This case having been duly submitted for decision and this Court, after due deliberation, having rendered a decision herein; now, in conformity with said decision, it is hereby

**ORDERED** that plaintiffs' Motion for Judgment Upon the Agency Record challenging the United States Department of Commerce's determination in *Final Affirmative Countervailing Duty Determinations: Certain Steel Products from France,* 58 Fed. Reg. 37,304 (Dep't Comm.1993) (*"Final Determination"*) is granted in part and denied in part; and it is further

**ORDERED** that defendant-intervenors' Motion for Judgment on the Agency Record challenging the *Final Determination* is denied; and it is further

**ORDERED** that the *Final Determination* is sustained with the exception of the issue whether certain Credit National loans made for export promotion, discovered during verification, conferred a countervailable benefit upon Usinor Sacilor; and it is further

**ORDERED** that the issue of whether certain Credit National loans made for export promotion conferred a countervailable benefit upon Usinor Sacilor is remanded for further analysis to the Department of Commerce, International Trade Administration; and it is further

**ORDERED** that Commerce will file the results of the remand with this Court no later than June 30, 1997; and it is further

**ORDERED** that plaintiffs and defendant-intervenors shall file joint comments on the remand no later than July 7, 1997. Defendant shall file comments in response to plaintiffs' and defendant-intervenors' comments no later than July 14, 1997. Comments submitted by the parties shall not exceed seven pages.